[Cite as *State ex rel. DeWine v. Fred's Party Ctr., Inc.*, 2014-Ohio-2358.]

STATE OF OHIO, BELMONT COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

STATE ex rel. MICHAEL DeWINE,  )
ATTORNEY GENERAL OF OHIO,  )
　　　　　　　　　　　　　　　　)　　CASE NO.　　13 BE 29
　　　PLAINTIFF-APPELLEE,　　)
　　　　　　　　　　　　　　　　)
VS.　　　　　　　　　　　　　　)　　O P I N I O N
　　　　　　　　　　　　　　　　)
FRED'S PARTY CENTER, INC., et al.,  )
　　　　　　　　　　　　　　　　)
　　　DEFENDANTS-APPELLANTS.　)


CHARACTER OF PROCEEDINGS:　　　Civil Appeal from Common Pleas Court,
　　　　　　　　　　　　　　　　　　　　Case No. 13CV263.


JUDGMENT:　　　　　　　　　　　　Affirmed.


APPEARANCES:
For Plaintiff-Appellee:　　　　　　　　　Attorney Michael DeWine
　　　　　　　　　　　　　　　　　　　　Ohio Attorney General
　　　　　　　　　　　　　　　　　　　　Attorney Charissa Payer
　　　　　　　　　　　　　　　　　　　　Principal Assistant Attorney General
　　　　　　　　　　　　　　　　　　　　30 East Broad Street, 26th Floor
　　　　　　　　　　　　　　　　　　　　Columbus, Ohio  43215

For Defendants-Appellants:　　　　　　Attorney Dennis McNamara
　　　　　　　　　　　　　　　　　　　　88 East Broad Street, Suite 1350
　　　　　　　　　　　　　　　　　　　　Columbus, Ohio  43215


JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Cheryl L. Waite


　　　　　　　　　　　　　　　　　　　　Dated:  June 2, 2014

VUKOVICH, J.

{¶1} Defendant-appellant Fred's Party Center, Inc. et al. appeal the decision of the Belmont County Common Pleas Court in the nuisance abatement action filed by the Ohio Attorney General. Appellant first contends that the trial court erred in admitting laboratory reports without testimony from the authors of the reports and claims that there is no evidence of a controlled substance without those reports. The attorney general insists that the reports were admissible under a statute that clearly only applies to criminal prosecutions. In any event, appellant allowed testimony that three packets from appellant's Bridgeport store tested positive. Thus, the only issue is the report concerning the test results of one packet purchased from appellant's Martins Ferry store. The admission of the results from that one packet is harmless under all of the circumstances of this case.

{¶2} Appellant alternatively argues that the court erred in ordering the closure of the two stores for one year as a remedy, arguing that they were diligent in correcting the nuisance, the nuisance ceased to exist after the search warrant was executed, the government had unclean hands, and the order should have been narrowly tailored regarding the closure and the forfeiture of personal property and contents. However, traditional equity principles do not apply here as this is a statutory injunction action with remedies mandated upon the finding of the nuisance. The Supreme Court has created an exception if the case involves an "owner who did not negligently or knowingly acquiesce to, and did not participate in the creation or perpetuation of the nuisance." However, whether appellant fits within this exception is a matter of weight, credibility, and rational inferences best left for the trial court. The judgment of the trial court is affirmed.

STATEMENT OF THE CASE

{¶3} On July 23, 2013, the State of Ohio ex rel. Michael DeWine, Attorney General of Ohio, filed a civil nuisance complaint against Fred's Party Center, Inc. dba Martins Ferry Party Center and Bridgeport Party Center and owners Frederick and Joyce Fryman due to the stores' selling of herbal incense containing XLR11, a schedule I controlled substance. The attorney general filed a motion in limine asking

the court to accept the affidavits and lab reports of two BCI scientists as prima facie evidence regarding the presence of XLR11 in four samples purchased from the stores. The court granted the request to accept the reports in lieu of live testimony.

{¶4} The case was tried to Judge Fregiato of the Belmont County Common Pleas Court on September 5, 2013. A lieutenant employed by the Bridgeport Police Department, who was also a member of the Belmont County Drug Task Force, testified that he noticed a change in the volume of traffic at the drive-thru of Bridgeport Party Center, and he received complaints concerning sales of synthetic marijuana from the store. (Tr. 10, 12, 14). On February 15, 2013, the lieutenant attended an Ohio Attorney General class on investigating synthetic cannabinoids.

{¶5} The next day, he entered Bridgeport Party Center while in uniform in order to look for various indicators of illegality suggested in the class. He saw ten boxes of different kinds of "herbal incense" packets in plain view on a shelf behind the counter by the cigarettes. (Tr. 16-17, 34). He asked the clerk to see a packet, and she showed him the "Diablo." When he asked why the label said the user must be over eighteen, she responded that it was a tobacco product. (Tr. 18). The cheapest herbal incense they sold was $22 for one packet. (Tr. 19). The lieutenant asked if they carried any other incense, and she asked if he meant the kind used for aroma and pointed to a shelf (not behind the counter) containing sticks of regular incense selling for 25 cents per stick. (Tr. 18).

{¶6} The Belmont County Drug Task Force then decided to make controlled purchases. On February 20, 2013, an undercover officer entered Bridgeport Party Center with a recording device and asked for recommendations on "fake weed." (Tr. 23). The clerk recommended "Mr. Happy" for $67, which the officer could not buy as he was only provided $50 in buy money. (Tr. 24). Instead, he purchased "Platinum" and two cigar wraps for $23.97. (Tr. 24).

{¶7} That same day, an undercover officer with a recorder went through the drive-thru of Martins Ferry Party Center, the other store owned by Fred's Party Center, Inc. He asked if they had "any of that Diablo, the fake weed" and a pack of cigar wraps. (Tr. 50). He made the purchase for $23.51 and requested a receipt but was

told they "don't do receipts." (Tr. 50-51). The packet claimed that it was sold as incense only, it was not for human consumption, and "It's Legal in 50 States, 100% Legal."

{¶8} The Belmont County Drug Task Force submitted the packets from the two stores to BCI for testing. In the meantime, the Belmont County Prosecutor wrote a letter to various businesses in the county that were selling suspicious incense. The letter was hand-delivered to both Bridgeport Party Center and Martins Ferry Party Center on March 7, 2013. In the letter, the prosecutor stated that the Belmont County Drug Task Force informed him that "you may be selling synthetic marijuana, incense, and/or bath salts that are being smoked or ingested by your patrons."

{¶9} The prosecutor explained: "Despite what the labels on these packages provide, that they do not contain illegal substances, most if not all of these products do contain illegal substances." The prosecutor noted that the recipient was a respectable business in the community and expressed desire to assist the recipient in avoiding future problems by "urging you to cease selling these items immediately and remove all of them from your store." The prosecutor warned: "Failure to remove these items and immediately cease selling them could lead to criminal prosecution." It was explained that the minimum offense would be fifth-degree felony drug trafficking under R.C. 2925.03, and it was reiterated that the letter was sent: "So you will know that the bath salts, incense and/or synthetic marijuana that you have in your store should not be sold. That they should immediately be removed from your shelves with no further sales occurring." The letter closed by noting a recent increase in crimes in the county committed by those under the influence of these items and stating that the prosecutor's office and the drug task force were counting on their help to combat the problem.

{¶10} Instead of complying with the letter, Mr. Fryman consulted with his attorney, who responded to the prosecutor's letter the next day by writing a letter stating: "The Party Centers have been advised that nothing they sell contains any illegal substance. They, however, are willing to test this assertion." The letter then stated that they will provide some incense to the prosecutor who should test it after

which they would stop selling it "if you advise there is something in it the Party Centers are not aware of. However, NIK or field testing would not be sufficient." The letter concluded by instructing the prosecutor to call to arrange the testing.

**{¶11}** On March 22, 2013, an undercover officer entered Bridgeport Party Center and asked for "fake weed" and papers. He purchased an eleven-gram packet of "Kush" and a ten-gram packet of "Klimax" for a total of $127. (Tr. 25-26). The "Kush" packet stated that it contained no nicotine or tobacco, it was not intended for human consumption, it was lab certified to contain no prohibited chemicals, and it was legal for sale in all fifty states as of September 1, 2011. The other packet was covered in pictures of marijuana leaves, claimed that it was not to be burned or smoked yet stated that one must be eighteen to purchase, and proclaimed that it does not contain cannabicyclohexanol. Thirty minutes later, the officer went through the drive-thru and purchased "Diablo" and "OMG." (Tr. 28-19 31).

**{¶12}** The lieutenant from Bridgeport testified that the four packets purchased from Bridgeport Party Center were submitted to BCI. He explained that the first packet ("Platinum") and the last packet ("OMG") tested negative for XLR11 but the packets labeled "Kush" and "Klimax" and "Diablo" tested positive for XLR11. (Tr. 29, 31).

**{¶13}** A Belmont County Drug Task Force member from Martins Ferry Police Department thereafter testified that the "Diablo" purchased from Martins Ferry Party Center tested positive for XLR11. Defense counsel objected at this point. (Tr. 51). The state presented the lab report regarding this test, and the court ruled it admissible, overruling the objection. (Tr. 52).

**{¶14}** After the positive test results came back, search warrants for the stores and the Fryman residence were obtained. (Tr. 42-43, 53). The Martins Ferry officer testified that they seized packets of incense and paraphernalia, such as smoking bowls and pipes, from the residence. (Tr. 54). He also stated that the search of a computer produced a sales report showing that the sales of "Herbal" from both stores was over $4 million dollars in less than two years. (Tr. 55, 58).

**{¶15}** Both officers testified that they had experienced no issues with the stores prior to this investigation. (Tr. 44, 49). An individual who distributes beer to the stores

opined that the Frymans were honest and would not knowingly violate the law. (Tr. 65-66). An individual who sells the stores advertising testified likewise. (Tr. 69-70).

**{¶16}** Mr. Fryman testified that he employs 21 mostly full-time employees and sells beer, wine, lottery tickets, and food. (Tr. 94-95). He disclosed that he first started selling the herbal incense in August of 2011, after he received customer requests and discovered that an employee was buying his supply from a local competitor. (Tr. 98, 108-109). He had his manager find a supplier online from whom he received weekly shipments by a private mail carrier.

**{¶17}** He explained that each shipment arrived with a laboratory report. (Tr. 99). The lab reports that came with the shipment of "Diablo" and "Kush" and "Klimax" were submitted as exhibits. The reports claimed that the samples were tested in April 2012. Various substances were listed, and the report stated that tests for those listed substances were negative. No test had been run for XLR11. The "Diablo" report also stated that the sample was found not to contain any synthetic cannabinoids as designated in an Arizona law. Mr. Fryman said that his manager was a friend of the owner of Shadyside Party Center and he was aware that said owner asked the Shadyside police to test some samples. (Tr. 106).

**{¶18}** Upon receiving the prosecutor's letter on March 7, 2013, the two stores owned by Fred's did not stop selling the incense. Instead, Mr. Fryman consulted with his attorney. (Tr. 101). He said that this was not the first time he showed a supplier's lab report to his attorney as he brought him a report each time he received a new item. (Tr. 45). Mr. Fryman noted that his wife, who runs the Martins Ferry store, stopped selling the products a few weeks before the April 12, 2013 search warrant was executed, which defense counsel estimated to have been March 21, 2013 (the day after other businesses were raided). (Tr. 104). However, they were still selling the herbal incense at the Bridgeport store at the time of the April 12 search warrant.

**{¶19}** Mr. Fryman stated that if he had been made aware that the product was illegal, he would have stopped selling it. (Tr. 107). He said that his mark-up on the product was 58%, higher than many other products, and that he arrived at this figure by pricing according to his competition. (Tr. 109). When asked why he refused to sell

the incense to those under 18, he stated that they have less money and may not use it correctly, noting that some people smoked it. (Tr. 111).

**{¶20}** Attorney Nichelson testified that he represented the Frymans for over twenty-five years. He testified that Mr. Fryman showed him a laboratory report from the suppliers of the incense for the first time in March 2013. (Tr. 81, 90). He said that Mr. Fryman asked him about the substances that the suppliers claimed were not in the packets and the attorney noted that there is an ever-changing list of drugs covered by Ohio's statute. (Tr. 89). He advised Mr. Fryman, "If you ever find that there's anything in anything, stop selling it immediately." The attorney also testified that Mr. Fryman was very concerned about the prosecutor's letter. (Tr. 85).

**{¶21}** On September 24, 2013, the trial court found by clear and convincing evidence that the defendants committed and participated in felony drug trafficking violations of R.C. 2925.03 and were liable for maintaining a nuisance under R.C. 3719.10.[1] The court found that they were aware the products they were selling were illegal. The court found the nuisance was subject to abatement. The court permanently enjoined the defendants from maintaining a nuisance by selling controlled substances disguised as incense and potpourri or otherwise. The court ordered the forfeiture of personal property and contents used in conducting or maintaining the nuisance (said to be all personal property and contents confiscated by law enforcement authorities). Finally, the court ordered the two stores to be closed for any purpose and remain closed for a period of one year unless sooner released as per R.C. 3767.06.

**{¶22}** Fred's Party Center, Inc. et al. [hereinafter appellant] filed a timely appeal. The trial court granted a stay pending appeal upon the posting of a $50,000 bond. This appeal was originally consolidated with *State of Ohio ex rel. DeWine v. Shadyside Party Center*, 7th Dist. No. 13BE26. However, the appeals have been

---

[1]The court also found the maintaining of a public nuisance under R.C. 4729.35 due to violations of R.C. 2925.03, described by the court as a law controlling the distribution of a drug of abuse. *See* R.C. 472935 ("The violation by a pharmacist or other person of any laws of Ohio * * * controlling the distribution of a drug of abuse as * * * is hereby declared to be inimical, harmful, and adverse to the

deconsolidated as these were different trials before different judges with different facts and *Fred's* presents evidentiary issues not present in *Shadyside.*

## INTRODUCTION

**{¶23}** XLR11 is a synthetic cannabinoid laced on plant material and promoted as an herbal incense product but which is smoked for psychoactive effects. XLR11 was specifically added to the schedule I controlled substance list under the category for hallucinogens on December 20, 2012.[2] Trafficking in a schedule I controlled substance or a controlled substance analog is a felony. *See* R.C. 2925.03.

**{¶24}** Premises or real estate on which a felony violation of Chapter 2925 or 3719 occurs constitutes a nuisance subject to abatement pursuant to Chapter 3767. *See* R.C. 3719.10. *See also* R.C. 3767.01(C)(1) (a nuisance includes that which is defined and declared by statute to be a nuisance). Pursuant to R.C. 3767.02 (A), any person who uses, occupies, establishes, or conducts a nuisance, or aids or abets in the use, occupancy, establishment, or conduct of a nuisance; the owner, agent, or lessee of an interest in any such nuisance; any person who is employed in that nuisance by that owner, agent, or lessee; and any person who is in control of that nuisance is guilty of maintaining a nuisance and shall be enjoined as provided in R.C 3767.03 to 3767.11.

**{¶25}** When a nuisance exists, the attorney general can bring an action in equity in the name of the state upon the relation of the attorney general. *See* R.C. 3767.03. At the hearing, evidence on the general reputation of the place where the

---

public welfare of the citizens of Ohio and to constitute a public nuisance."). The same procedure applies to either nuisance. *See* R.C. 3767.01(C)(1).

[2]Before this, various synthetic substances had been added to the list that were being sold on the streets as Spice, K2, or bath salts, and controlled substance analogs were defined and treated as schedule I controlled substances. *See* R.C. 3719.01(HH)(1) with (a) (providing a "substantially similar" chemical structure test for proving a controlled substance analog); R.C. 3719.013 (treated as a schedule I substance if intended for human consumption); R.C. 3719.41(C)(35) (adding JWH-018). See also Intent of these amendments, effective Oct. 17, 2011. A major purpose of controlled substance analog laws is to prohibit innovative drugs not yet scheduled as controlled substances. *See U.S. v. Washam*, 312 F.3d 926 (8thCir.2002). Manufacturers change a molecule in a substance and claim it is legal until the government has the time to classify and schedule the new substance. It is considered difficult to prosecute the sale of a substance until it is specifically scheduled because complex scientific testimony is necessary in order to prove an analog. It is being urged by the DEA in various federal cases that XLR11 is a controlled substance analog of JWH-018.

nuisance is alleged to exist is prima facie evidence of the nuisance and of knowledge of and acquiescence and participation in the nuisance on the part of the person charged with maintaining it. R.C. 3767.05(A). If the existence of the nuisance is established, a judgment shall be entered that perpetually enjoins the maintenance of the nuisance at the place complained of. R.C. 3767.05(D) (and elsewhere by that defendant).

{¶26} Pursuant to R.C. 3767.06(A), if the existence of a nuisance is established, an order of abatement shall be included in the judgment entry under R.C. 3767.05(D). The order shall direct the removal from the place where the nuisance is found to exist all personal property and contents used in conducting or maintaining the nuisance and the sale of such property belonging to a defendant who was notified or who appeared. R.C. 3767.06(A). If a closing order was not issued earlier, the court shall include an order directing the effectual closing of the place where the nuisance is found to exist against its use for any purpose and keeping it closed for a period of one year unless sooner released. *Id.* The owner of any place closed and not released under bond may appear and obtain a release in the manner and upon fulfilling the requirements provided in R.C. 3767.04 (which provides the ability to provide bond in the full amount of the property value to avoid closure if the court is satisfied of the good faith of the owner on keeping the nuisance abated). *Id.*

ASSIGNMENT OF ERROR NUMBER ONE

{¶27} Appellant sets forth two assignments of error, the first of which provides:

{¶28} "THE TRIAL COURT ERRED WHEN OVER OBJECTION IT ADMITTED THE LABORATORY REPORTS OF THE OHIO BUREAU OF CRIMINAL INVESTIGATION WITHOUT THE TESTIMONY OF THE AUTHORS OF THOSE REPORT[S]."

{¶29} An April 8, 2013 report from a BCI scientist found that the packets of "Kush" and "Klimax" and "Diablo" from Bridgeport Party Center contained XLR11 but the "OMG" contained no controlled substance. An April 9, 2013 report from a BCI scientist found that the "Diablo" purchased from Martins Ferry Party Center contained XLR11. These lab reports were attached to the complaint as exhibits accompanied by

supporting BCI affidavits outlining the scientists' education, training, experience, and duties and attesting that scientifically accepted tests were performed with due caution and that evidence was handled in accordance with established procedures. The affidavits contained a notice that they constitute prima facie evidence of the content, weight, and identity and are admissible without further testimonial evidence and that the accused has the right to demand the signer's testimony upon serving a demand on the prosecutor within seven days, citing R.C. 2925.51.

{¶30} That statute provides that in any criminal prosecution for a violation of Chapter 2925 or Chapter 3719, a laboratory report from the BCI can be used as prima facie evidence of the content, identity, and weight of a controlled substance if a notarized statement is attached to the report stating various information about the signer and attesting various items regarding the testing. R.C. 2925.51(A). The statute requires the prosecutor to serve a copy of the report on the defendant containing notice of the defendant's right to demand the testimony, and then, within seven days of that service, the defendant can serve on the prosecutor a demand for the signer's testimony so that the report is no longer prima facie evidence. R.C. 2925.51(B)-(D). This is considered a notice and demand statute utilized to show waiver of a criminal defendant's confrontation rights.

{¶31} On August 19, 2013, the attorney general filed a motion in limine asking the court to admit the BCI lab reports with the attached affidavits. The attorney general urged that if such lab reports can be utilized as prima facie evidence under R.C. 2925.51(A) in a criminal case (where the standard is beyond a reasonable doubt), then such reports should be admissible in a civil case as well. The attorney general claimed that unless the defendants intended to offer a legitimate challenge to the qualification of either scientist or challenge the well-accepted scientific methodology, in-person testimony would be unnecessary, noting the high caseload at BCI.

{¶32} On August 21, 2013, the defense filed a memorandum in opposition, describing the attorney general's argument as a request to amend a statute or to create a new rule of evidence to allow proof of facts without testimony on the facts or

identification or authentication of the documents. The defense pointed out that R.C. 2925.51(A) is only applicable "in criminal prosecutions." The defense also pointed out that even when the statute applies, the reports cannot be admitted as prima facie evidence if the defendant objects under R.C. 2925.51(C).

{¶33} On August 23, 2013, the trial court granted the attorney general's motion in limine, ruling that it would allow the reports as evidence under R.C 2925.51. At trial, the court similarly ruled that the reports were admissible in this civil proceeding because they were admissible in criminal proceedings. (Tr. 52).

{¶34} On appeal, appellant asserts that the court erred in accepting the state's two exhibits because the pertinent portions of the statute only apply "in a criminal prosecution for a violation" of Chapter 2925 or Chapter 3719. Appellant notes that it was the attorney general's burden in this nuisance action to prove a violation of R.C. 2925.03 by showing the presence of XLR11 in the products tested. Appellant concludes that without the test results, the attorney general only proved they sold incense and potpourri with certain labels.

{¶35} The attorney general initially notes that appellant's attorney did not protest the lab reports and stipulated to their admission in the earlier *Shadyside* case. As appellant replies, this argument is improper as an attorney can stipulate for one client and object for another depending on trial tactics and client requests.

{¶36} The attorney general also states that because this was a civil case, the defense should have obtained the testimony of the scientists in discovery or through subpoena. As appellant replies, the point was not that the defense wanted to question the scientists. Rather, the issue was that the attorney general had the burden to prove the products contained a controlled substance and appellant had the right to challenge evidence as hearsay.

{¶37} Appellant cites some cases refusing to extend division (E) of R.C. 2925.51 to cases that do not involve violations of Chapter 2925 or 3719; division (E) refers to a person accused of a violation of Chapter 2925 or 3719 and deals with independent testing by the defense. *See State v. Starcic*, 8th Dist. No. 72742 (June 4, 1998) (holding that independent testing provision in division (E), does not apply to

probation violation); *State v. Purdon,* 24 Ohio App.3d 217, 218, 494 N.E.2d 1154 (12th Dist.1986) (holding that legislature limited division (E) to violations of Chapter 2925 and 3719 and it does not apply to prosecution under Chapter 4511); *State v. Starr,* 8th Dist. No. 56819 (Apr. 5, 1990) (division (E)'s statement that defense expert can be present at test if sample is too small to preserve does not apply to blood evidence in rape case and concluding that there is no authority for extending the statute). *See also State v. Syx,* 190 Ohio App.3d 845, 2010-Ohio-5880, 944 N.E.2d 722, ¶ 31-32 (R.C. 2925.51 is inapplicable to prosecutions under 4511.19; cannot rewrite a similar "notice and demand" statute in 4511 to include an offense not listed)*.*

**{¶38}** The attorney general states that whether the statute can be used in a civil case is a case of first impression, urging that the cases cited by appellants did not preclude the application of the pertinent statutory procedure in civil cases. The attorney general then insists that the trial court's acceptance of the lab reports under R.C. 2925.51 was proper and posits that the statute deals with evidentiary procedure and is not a true criminal statute.[3]

**{¶39}** Although this is not a "criminal prosecution" for a violation of chapter 2925 or 3719, it is worth noting that the complaint does rely upon such a violation as the nuisance action is based upon the allegation of a felony violation of 2925.03 due to the presence of a controlled substance listed in schedule I, which is contained in R.C. 3719.41(C)(41).  However, the pertinent portions of R.C. 2925.21 establish the procedure for certain defendants to waive criminal confrontation rights concerning lab results. *See State v. Pasqualone,* 121 Ohio St.3d 186, 2009-Ohio-315, 903 N.E.2d 270, ¶ 15. *See also Melendez–Diaz v. Mass.,* 557 U.S.305, 321, 326-327, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) (discussing notice-and-demand statutes such as this).

**{¶40}** R.C. 2925.51(A) has plain language, "in criminal prosecutions," and this is not a criminal prosecution.  Thus, contrary to the attorney general's argument,

---

[3]The attorney general also urges that one should not read the defense's opposition to the motion in limine as a demand for testimony under R.C. 2925.51(C) because a demand was not needed as civil discovery was available.  This is akin to arguing that division (A) should extend to civil cases but the other divisions should not, even though the affidavits themselves cite divisions (C) and (D) and state

division (A) of said statute is not applicable. Even though the statute is inapplicable here, there are other paths to admissibility as test results can be admitted through stipulations or waiver for failing to object or actual elicitation of the evidence.

**{¶41}** At the start of trial on September 5, the court was informed that the parties were stipulating to the exhibits that each had to offer. (Tr. 4). They then agreed to offer the exhibits as they went through the applicable testimony. (Tr. 4-5). Defense counsel said there was no dispute as to venue, jurisdiction, or the statutory authority to bring the action. (Tr. 5). He then declared, "And even as to the two lab reports, which I filed a memorandum objecting to on hearsay grounds, and based on R.C. 2925.51(C), we do not dispute their identification or authenticity." (Tr. 6).

**{¶42}** The Bridgeport lieutenant testified first. As aforementioned, he stated that they sent the products from Bridgeport Party Center to BCI for analysis. *Without objection, he testified that the results were positive for XLR-11.* (Tr. 29). On cross-examination, defense counsel thrice elicited that the BCI results from the first Bridgeport Party Center purchase ("Platinum") came back negative, which was information from a third lab report not part of the state's case. (Tr. 30-31, 37-39). Defense counsel also elicited from the lieutenant that the last purchase ("OMG") tested negative, which was additional information from the first lab report (which the state did not present as the defense did not object to the lieutenant's testimony on the results). (Tr. 31). Defense counsel even inserted here a factual statement that lab reports from other local stores came back positive for the drug. (Tr. 38-39).

**{¶43}** Thus, as to the purchases from the Bridgeport Party Center, appellant cannot now argue that there was no admissible evidence of XLR11 presented. The exhibits were said to be stipulated at least as to identity and authenticity, and one exhibit was a lab report and affidavit showing that three packets purchased from Bridgeport Party Center tested positive for XLR11. *And then, the lieutenant testified without objection that these three packets tested positive for the drug.* See Evid.R. 103(A)(1) (error may not be predicated upon a ruling which admits evidence unless a

---

that the accused can file a demand within seven days. In any event, appellant's brief does not argue that a demand was made because it emphasizes that the statute is inapplicable.

substantial right of the party is affected and a timely objection or motion to strike appears of record).

**{¶44}** As defense counsel admitted, a pretrial motion in limine was only a preliminary, anticipatory ruling. *See State v. Grubb*, 28 Ohio St.3d 199, 201-202, 503 N.E.2d 142 (1986) (a decision on a motion in limine is a tentative, interlocutory, precautionary ruling by the trial court reflecting its anticipatory treatment of an evidentiary issue and not a final determination as the court can change its mind at trial where the issue is presented in testimonial context). In order to preserve any objection to a pretrial ruling, the defendant has to raise the issue again at the proper place at trial. *See State v. Hill*, 75 Ohio St.3d 195, 202-203, 661 N.E.2d 1068 (1996) (the denial of a motion in limine does not preserve a claimed error for review in the absence of the defendant making a contemporaneous objection to the actual admission of the evidence at trial), citing *State v. Brown*, 38 Ohio St.3d 305, 528 N.E.2d 523 (1988).

**{¶45}** Furthermore, the ruling dealt with the lab reports, but no objection was entered to the testimony as it was presented. In fact, it was evident that the defense was employing trial strategy to elicit further testimony on a negative result in the report now contested and to elicit a negative result from yet another report. The unobjected to testimony itself provided the evidence appellant now states is lacking (as to the Bridgeport purchases). As the defense permitted the lieutenant to testify to the test results, the lab report was not necessary, and appellant's argument regarding the lack of Bridgeport test results lacks merit.

**{¶46}** As for the Martins Ferry Party Center test result, an objection was entered. The Martins Ferry police officer testified that the purchased packet was sent to BCI for testing and that he received the test result back from BCI. The state asked if it was correct that the packets were positive for XLR11, and the officer responded in the affirmative. It was at this point that the defense objected. The court asked, "Aren't those test results into evidence? Didn't you stipulate to all test results?" (Tr. 51). The defense answered, "No, we do not. That's the part that you granted by the motion in limine, which is, of course, a preliminary order. And when they're offered, I'll be

objecting to them here as hearsay, absent the lab person, and his is hearsay on hearsay to say what the lab person said." The court then instructed the prosecutor to present the report to the witness and reiterated the in limine ruling that if the reports are admissible in criminal proceedings, then they are admissible in civil proceedings. (Tr. 52). (The court then mentioned that there was one positive test result for Martins Ferry and three for Bridgeport.)

{¶47} In this case, the prior stipulation to the exhibits did not waive the ability to object to hearsay thereafter. In proximity to this statement, counsel stated that he did not object to the identity or authenticity of the reports. He did not thus stipulate to both the identification *and the content* of the exhibits. *Compare State v. Keck*, 137 Ohio St.3d 550, 2013-Ohio-5160, 1 N.E.3d 403, ¶ 18 (when defendant stipulated to the admissibility and content of a non-testifying analyst's scientific report, he waived any later confrontation challenge to the use of the report by other witness).

{¶48} That said, the prior stipulation to the exhibits and the stipulation to the identity and authenticity of the reports combined with the essential agreement to admit the test result from the Bridgeport store and the further elicitation of testimony regarding that lab report and another Bridgeport lab report (and lab reports regarding other businesses even) raises a question as to whether counsel should be permitted to thereafter object to testimony on the test results from the Martins Ferry store. That is, it could be considered waiver where counsel makes such statements in opening and then allows and elicits results from various BCI reports and then objects to the later testimony on another test result gleaned from a report which does not contain information favorable to the defense but is the same type of information allowed by the defense earlier: lab reports from BCI (with affidavits attached) on products purchased from Fred's.

{¶49} In any event, the Martins Ferry test can be considered harmless. Contrary to the attorney general's suggestion, the availability of discovery or subpoena power or lack of surprise does not eliminate a hearsay argument merely because this is a civil case. Still, the fact that this is a civil case does make the harmless error doctrine harder for appellant to overcome, especially considering that there is not a

constitutional confrontation issue applicable in criminal cases. Due to all of the surrounding circumstances, including the fact that testimony was permitted that three packets tested positive for XLR11, the issue regarding the lab report is harmless under Civ.R 61, which provides:

**{¶50}** "No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

**{¶51}** An improper evidentiary ruling thus constitutes reversible error only when the error affects the substantial rights of the adverse party or the ruling is inconsistent with substantial justice. *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323, ¶ 35, citing *O'Brien v. Angley*, 63 Ohio St.2d 159, 164-165, 407 N.E.2d 490 (1980). To find that substantial justice has been done, the reviewing court must review the prejudicial effect of the error and determine if the fact-finder would probably have made the same decision without the error. *Id.*

**{¶52}** Appellant argues that the attorney general's burden was not met in the absence of positive test results. Since appellant wants all reports ruled inadmissible, appellant does not address whether the burden was met if only the report concerning the "Diablo" purchased from Martin Ferry is ruled inadmissible. As the test results from Bridgeport were properly put in evidence, the issue would become whether the trial judge would have declared the Martins Ferry Party Center a nuisance for selling incense without a positive test result for the "Diablo" packet, i.e. whether the trial judge would "probably" have rendered the same decision in the absence of the positive test result from Martins Ferry. *See Beard*, 106 Ohio St.3d 237 at ¶ 35.

**{¶53}** Pursuant to R.C. 3719.10, premises on which a felony violation of Chapter 2925 or 3719 occurs constitute a nuisance subject to abatement pursuant to

Chapter 3767. It has been stated that there is sufficient evidence of such nuisance where the state provided clear and convincing evidence that felony violations of Chapter 2925 chronically occur on the property (even if not still occurring at time of complaint or time of hearing). *State ex rel. Miller v. Anthony*, 72 Ohio St.3d 132, 647 N.E.2d 1368 (1995) The trial court found by clear and convincing evidence appellant committed and participated in the felony violations of the drug trafficking statute and had knowledge of the illegal substance. As the court pointed out, knowledge of circumstances can be found when the person is aware that such circumstances probably exist. *See* R.C. 2901.22. (Moreover, the issue of the sellers' knowledge is not raised in this assignment of error but is only asserted in the second assignment; that is, this assignment deals only with whether XLR11 was sold on the premises.)

{¶54} The same people own both the Bridgeport and the Martins Ferry Party Center. Three packets with different names from Bridgeport Party Center tested positive for XLR11. One of those packets was "Diablo." In viewing the exhibits depicting the packet of "Diablo" from the Bridgeport store and the packet of "Diablo" from the Martins Ferry store, it can be seen that the labels on the two "Diablo" packets are nearly identical if not completely identical (including design, UPC number, and labeling). Mr. Fryman's testimony suggested that his company as a whole has one supplier that they found online. It was admitted that both stores did a brisk business in the selling of herbal incense received from the online supplier. The packets were sold upon requests for "fake weed" and were often sold with rolling paper or wraps.

{¶55} The testimony established that some packets from Bridgeport Party Center tested negative for the drug. The fact that some packets contain the drug and others did not contain the drug does not mean that a positive result is absolutely required for a specific purchase from Martins Ferry under the circumstances of this case. The prosecutor's letter revealed that not every packet may test positive by using the language, "most, if not all of these products do contain illegal substances." And, the hit-or-miss drug presence can be seen as attributable to the uneven nature of the spraying of the chemical onto the vegetation, a process explained by defense counsel. In any event, the packets that tested negative were not "Diablo."

**{¶56}** The attorney general demonstrated that some of the packets (ordered by Fred's for both of its stores) contained XLR11. We cannot proclaim that the lack of a test result for the "Diablo" purchased from the Martins Ferry Party Center would have "probably" resulted in the dismissal of the nuisance action against that store. This is not a criminal action. In a nuisance action such as this, *even mere reputation evidence can result in a finding of a nuisance.* *See* R.C. 3767.05(A) ("In the civil action, evidence of the general reputation of the place where the nuisance is alleged to exist * * * is admissible for the purpose of proving the existence of the nuisance and is prima-facie evidence of the nuisance and of knowledge of and of acquiescence and participation in the nuisance on the part of the person charged with maintaining it.") Thus, the allegation of inadmissible testimony on test results concerning the one packet of "Diablo" did not affect substantial rights or result in a judgment inconsistent with substantial justice in the determination of whether a nuisance existed at Fred's Martins Ferry location, which sold the same substances as Fred's Bridgeport location.

**{¶57}** In conclusion, the statute relied upon to admit the test results is not applicable here. Still, the test results as to the purchases from Bridgeport Party Center were properly in evidence as no objection was entered to the lieutenant's testimony on those test results and defense counsel then elicited more testimony from the lieutenant regarding those results and other results. An objection was later entered as to yet another test result from Martins Ferry Party Center, but either the door was already open and/or the admission of that result was harmless due to the fact that both stores had the same owners and the same supplier, the stores did a thriving business of selling these packets, and the "Diablo" from the Bridgeport store tested positive while the Martins Ferry store sold a packet of "Diablo" with an identical label. This assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER TWO

**{¶58}** Appellant's second assignment of error provides:

**{¶59}** "THE TRIAL COURT ERRED WHEN [THE COURT] ORDERED THAT FRED'S PARTY CENTERS BE CLOSED FOR A PERIOD OF ONE YEAR."

**{¶60}** Appellant specifically does not contest the finding of a nuisance under this assignment of error. Rather, appellant contests the abatement order on various grounds dealing with the application of R.C. 3767.06(A), which provides that if a nuisance is established and if a closing order was not issued prior to the hearing, the court shall include an order directing the effectual closing of the place where the nuisance is found to exist against its use for any purpose and keeping it closed for a period of one year unless sooner released. The owner may appear and obtain a release in the manner and under the requirements in R.C. 3767.04 (full property value bond; pay costs incurred; nuisance terminated; finding of good faith). R.C. 3767.06. The application of this statute has been amended by Supreme Court ruling, however, as to certain defendants.

**{¶61}** In *Rezcallah,* the owners had tenants or trespassers who committed drug offenses. The Court pointed out that a nuisance had been established as defined in R.C. 3719.10 (felony violation of Chapter 2925 occurs on premises) because there is no requirement of knowledge, acquiescence, or participation on the part of the owner of the property in order to deem the property a nuisance and find the owner guilty of the civil offense of maintaining a nuisance. *State ex rel. Pizza v. Rezcallah*, 84 Ohio St.3d 116, 122, 702 N.E.2d 81 (1998). The statute clearly provides that the closure order in such case is mandatory. *Id.* at 123. The Court noted that even though the nuisance action was an action in equity, statutory injunctions such as this are to issue without regard to traditional equitable considerations and acknowledged that the law leaves no discretion on the part of the trial judge as to the closure order. *Id.* at 127.

**{¶62}** The Court held, however, that as applied to defendants who bear no culpable responsibility in the nature of acquiescence or participation in the creation of the nuisance, the mandatory closure requirement (even with the opportunity for bond) is unconstitutional. *Id.* at 124. The Court's ruling dealt with those who lack culpability in the creation or perpetuation of a nuisance. *Id.* at 132. The Court concluded that if the owner acted in good faith, was innocent of any acquiescence to or participation in the conduct establishing the nuisance, and took prompt action to abate the nuisance, then no closure order shall be issued. *Id.*

**{¶63}** Before delving into the *Rezcallah* exception, appellant presses for the application of the unclean hands maxim that one who seeks equity must do equity. *See Basil v. Vincello*, 50 Ohio St.3d 185, 190, 553 N.E.2d 602 (1990). This doctrine requires that the party invoking equity "not be guilty of reprehensible conduct" regarding the subject matter of the suit. *Id.*

**{¶64}** The Ohio Supreme Court previously considered whether traditional concepts for the issuance of equity injunctions apply in a statutory injunction action. *Ackerman v. Tri-City Geriatric & Health Care, Inc.*, 55 Ohio St.2d 51, 378 N.E.2d 145 (1978). The Court stated that where the statutory conditions exist, the traditional equity principles are not also applicable. *Id.* at 56-57.

**{¶65}** The Court said it was established in Ohio that where a statute grants a specific injunctive remedy, the party requesting the injunction is not bound by the traditional rules of equity to show that great or irreparable injury is about to be done for which there is no adequate remedy at law. *Id.* at 56. The Court pointed out that statutory actions granting governmental agents the right to seek injunctive relief have a history and purpose different from equitable actions for injunctive relief. *Id.* at 57 (such statutes are designed by the legislature to benefit society by proscribing behavior which the legislature has determined to be contra to the public interest).

**{¶66}** Thus, the Court found it inappropriate to "require the Director of Health to do equity" (have clean hands) in a statutory injunction action against a nursing home operator as such injunctions "which authorize a governmental agent to sue to enjoin activities deemed harmful by the General Assembly are not designed primarily to do justice to the parties but to prevent harm to the general public." *Id.* The Court stated that permitting a party to operate an unlicensed home which violates essential requirements for licensing merely "because the Director has been slow to grant or deny appellee a license may balance the equities between the Director and appellee, but it ignores the legislative purpose behind the granting of such relief to protect the well being of those who reside in nursing homes." *Id.* at 57-58.

**{¶67}** Later, in a nuisance abatement action under the statutes at issue in this case, the Supreme Court stated that a nuisance abatement action is an equitable

action and concluded: "Nuisance abatement actions seek injunctive relief and, as such, are governed by the same equitable principles that apply to injunction actions generally." *See State ex rel. Miller v. Anthony*, 72 Ohio St.3d 132, 136, 647 N.E.2d 1368 (1995). Appellant suggests that this means that he can raise the equitable defense of unclean hands here. However, the *Anthony* holding was made in the context of ruling that there is no right to a jury trial in this type of nuisance action. *Id.*

**{¶68}** More recently, in the context of the nuisance statutes at issue herein, the Court reiterated its *Ackerman* holding that *it is inappropriate to* balance the equities *or require the state to do equity* in a statutory injunction action, noting that the authorization for the government agent to enjoin harmful activities is not designed to ensure justice for the parties but to protect the public. *Rezcallah*, 84 Ohio St.3d 116 (applying the *Ackerman* holding, that the statutory injunction should issue if the statutory requirements are fulfilled, to a nuisance abatement case). Thus, the unclean hands doctrine is not applicable.

**{¶69}** In any event, appellant did not raise this defense in the answer, and reprehensible conduct or unclean hands is lacking. For instance, appellant points to his testimony that he was aware that a different store owner had submitted samples of her products to an officer in Shadyside (and that the failure to test or report on those products represented unclean hands). (Tr. 106). Appellant states that because Mr. Fryman testified that his manager was a friend of the owner of Shadyside Party Center, it can be assumed that he knew if the police reported back to her. If such fact can be assumed, then it could also be assumed that he knew the products tested positive for an illegal substance when a search warrant was executed at the other owner's store (two weeks prior to the warrant executed at his store).

**{¶70}** Nevertheless, appellant cannot assert an alleged lack of equity as to a different store owner as a defense in this case. Furthermore, there was no evidence of unclean hands regarding that other owner presented in this trial. The defense did not conduct discovery on the matter or call others to testify as to whether the samples were tested and why they were not. In fact, a higher police official could rationally realize that they should not rely on samples volunteered by the very person alleged to

have been selling illegal products. And, a police department need not use its submission authority to have BCI conduct free testing for local businesses.

{¶71} In speaking of law enforcement's treatment of the stores owned by Fred's, appellant states that if the drug task force had provided the test results on Fred's products, the store would have stopped selling the products before the day the search warrant was executed. However, police need not tell a business that they are about to execute a search warrant based on test results that the products contained a controlled substance. In fact, the prosecutor's letter hand-delivered to the businesses a month prior to the search warrant warned them to cease selling the products and explained that most if not all of the packets contained illegal substances regardless of what the labels claimed.

{¶72} Rather than comply, appellant had an attorney draft a letter stating that they do not believe the product was illegal and would not stop selling it until the prosecutor runs a test and advises that it contains an illegal substance. The response stated that they would make the product available for testing but postulated that "NIK" or field testing would not be sufficient to make them stop selling the products. There is nothing reprehensible about the prosecutor refusing to bow to those demands and instead merely allowing the investigation to proceed. Contrary to appellant's argument, it cannot be said that law enforcement created the nuisance or permitted it to exist. For all of these reasons, the unclean hands argument lacks merit, and this equity argument is inapplicable in this statutory injunction action in any event.

{¶73} Next, appellant argues that the closure order should not have issued because they acted in good faith and promptly rectified the issue (after the search warrant was issued). Appellant relies on paragraph two of the *Rezcallah* syllabus, which states that R.C. 3767.06(A) requires a trial court, upon the finding of nuisance, to issue an injunction closing the property against its use but that to the extent that it allows release only through a bond in the amount of the full property value, the statute violates the constitution ***when applied to an owner who did not negligently or knowingly acquiesce to and did not participate in the creation or perpetuation of the nuisance***. *Rezcallah.* 84 Ohio St.3d 116 at ¶ 2 of syllabus. *Compare* R.C.

3767.04 (different than good faith required for posting a bond to reopen, which deals with court's belief that the nuisance will remain abated).

{¶74} The state urges that appellant did not act in good faith but rather turned a "blind-eye" to the illegality in order to make as much money as possible before a positive test result was returned by a government lab. The state disparages the reliance on odd lab reports from the supplier and statements of legality on the labels, characterizing this as appellant's mere belief that they had "insurance" against liability being imposed upon them if law enforcement discovered any newly scheduled controlled substances in the packets.

{¶75} Appellant compares the situation before us to *State ex rel. Allen Cty. Prosecutor v. Howard*, 3d Dist. No. 1-11-33, 2012-Ohio-404. That case merely refused to reverse a trial court's decision on the owners' lack of acquiescence and refused to adopt the prosecutor's argument that acquiescence existed as a matter of law. *See id.* at ¶ 39-40 (owners evicted sons upon discovering they were selling drugs from apartment attached to the market, terminated one son's employment, began to work at the market all day themselves, closed the market earlier to diminish drug activity around the market, called police over fifty times to curb the drug activity near the market, and told drug dealers to leave the area on multiple occasions.)

{¶76} Appellant also compares the situation before us to *State ex rel. Cleveland Dir. of Law v. Alahmad*, 8th Dist. No. 86447, 2006-Ohio-804. But, that case also dealt with a court's refusal to reverse a trial court's decision that the city did not demonstrate the owner acquiesced or participated in the drug law violations occurring at the premises. *See id.* at ¶ 40 (owner hired a security guard to remove loiterers, instructed his employees to ask loiterers to leave and to report drug trafficking to the police, repeatedly called the police to report illegal drug activity, ordered a new lighted canopy, and repositioned security cameras to photograph the parking lot).

{¶77} The trial court here found by clear and convincing evidence that appellant committed and participated in the felony violations of the drug trafficking statute and had knowledge of the illegal substance. Knowledge of circumstances can be found when one is aware that such circumstances probably exist. *See* R.C.

2901.22. This is not a case involving a property owner whose premises were considered a nuisance due to trafficking by another. Appellant was the seller who did a brisk trade in the substance at a highly inflated price. Appellant refused to sell the packets to those under 18. The packets had suspicious labeling regarding their legality and arrived with lab reports claiming that tests had been run for various synthetic cannabinoids. The reports did not claim a test had been conducted for XLR11.

{¶78} Appellant knew people smoked the substance and considered it "fake weed" even though they were labeled as "not for human consumption." Appellant knew there were laws on selling various synthetic drugs as Mr. Fryman testified that he checked the lab reports and asked about the substances that were claimed not to be in the packets. They talked about the state's list of illegal substances, but then ignored the fact that supplier's lab report did not test for the newly added substances.

{¶79} Moreover, after receiving a letter from the prosecutor, appellant continued to sell the products. This letter was hand-delivered two and one-half months after XLR11 was specifically added to the list of controlled substances. And, there is no grace period (even in criminal cases). *See, e.g., State v. Adams*, 12th Dist. No. CA2012-011-240, 2013-Ohio-4639, ¶14-15 (possession of bath salts three weeks after added to list). The letter disclosed that the Belmont County Drug Task Force informed the prosecutor "that you may be selling synthetic marijuana, incense, and/or bath salts that are being smoked or ingested by your patrons. Despite what the labels on these packages provide, that they do not contain illegal substances, most if not all of these products do contain illegal substances."

{¶80} The prosecutor urged appellant "to cease selling these items immediately and remove all of them from your store" and warned that the failure to remove the product and immediately cease selling it could lead to criminal prosecution for felony drug trafficking. The prosecutor again stated that the letter was sent "[s]o you will know that the bath salts, incense and/or synthetic marijuana that you have in your store should not be sold. That they should immediately be removed from your shelves with no further sales occurring."

**{¶81}** Appellant did not remove and stop selling the products. As aforementioned, Mr. Fryman had his attorney write a letter expressing that they do not believe the product was illegal and would not stop selling it until the prosecutor runs a test and discloses the illegality, also saying that they would make the product available for testing but postulating field testing would not be sufficient to make them stop selling the products. Thus, instead of complying with the prosecutor's request, appellant decided to gamble on the supplier's assertions that none of the packets contained illegal substances, assertions that could be considered highly suspect in any event. Or, appellant decided to gamble that a seller would not be subjected to liability due to the claimed reliance on the supplier's lab reports and willingness to have the product tested, i.e. appellant wanted to keep selling and making money pending an official lab report assuming that ignorance of an actual positive test would offer protection.

**{¶82}** But, a suggestion you will stop selling it if you are shown tests displaying an illegal substance does not mean a crime was not committed in the meantime. And, the continual race to stay ahead of controlled substance schedules reduces the rationality of reliance on such a letter as well, i.e., the letter can be seen as an attempt to entangle the prosecutor in a cycle of selling, demanding a stoppage, requesting testing, testing, stopping, selling a new formula, etc., etc.

**{¶83}** The trial court concluded that the defendants participated in and committed the felony violations and were aware that the products were illegal. Under the circumstances here, the matter is one of weight, credibility, and rational inferences. Appellant's argument on good faith in relation to the necessity of a closure order essentially asks us to find that the trial court's decision was against the weight of the evidence on the issue of whether this case involved an "***owner who did not negligently or knowingly acquiesce to, and did not participate in the creation or perpetuation of the nuisance***." *Rezcallah.* 84 Ohio St.3d 116 at ¶ 2 of syllabus (emphasis added). *See also id.* at 94 (no closure if "owner acted in good faith, was innocent of any acquiescence to or participation in the conduct establishing the nuisance, and took prompt action to abate the nuisance.").

**{¶84}** A rational fact-finder could conclude that appellant's situation was not similar to the defendants' situation in *Rezcallah* and did not fit the test set forth therein. Where the evidence is susceptible of more than one reasonable construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment. *See Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3. The trial judge was in the best position to weigh the credibility of those testifying, including Mr. Fryman, and make rational inferences regarding the evidence and the testimony. In conducting our review of that decision, we conclude that the trial judge did not clearly lose the way in resolving conflicts in the evidence and create a manifest miscarriage of justice. *See Eastley*, 132 Ohio St.3d 328 at ¶ 17, 20.

**{¶85}** Appellant also asserts here that by not continuing to sell drugs after the drug task force executed the search warrant, there was no nuisance to abate by the time of the hearing, citing the general rule of equity that a court does not issue an injunction to solve a problem that ceases to exist. As aforementioned, the traditional equitable principles do not apply when a statutory injunction is required by its terms. If appellant was not an owner that fit under the *Rezcallah* test, then the trial court had a mandatory statutory duty to order the closure after finding a nuisance regardless of whether the drug sales were still occurring at the time of the complaint or the time of trial. *See State ex rel. Miller v. Anthony*, 72 Ohio St.3d 132, 647 N.E.2d 1368 (1995) (felony drug violations need not be occurring at time of complaint or time of hearing in a case where owner was the seller). *See also Rezcallah.* 84 Ohio St.3d at 123-124.

**{¶86}** Appellant next states that a court issuing an abatement order must narrowly tailor it to address only the nuisance. Appellant claims that the order was overbroad because the court ordered the stores closed "for any purpose" for one year unless sooner released, citing and distinguishing *State ex rel. Rothal v. Smith,* 151 Ohio App.3d 289, 2002-Ohio-7328, 783 N.E.2d 1001 (9th Dist.) and *State ex rel. Roszmann v. Lions Den*, 89 Ohio App.3d 775, 627 N.E.2d 629 (12th Dist.1993).

**{¶87}** In the latter case, the appellate court addressed an argument that the trial court should have narrowly tailored the closure order and found that the trial court could close an adult bookstore because prohibiting only lewd behavior would not work where the patrons only frequented the business to engage in such behavior. *Roszmann*, 89 Ohio App.3d at 776. Appellant believes this means the permanent injunction abatement order here must be narrowly tailored and points out that, contrary to the situation in *Roszmann*, patrons did not only come to the premises for the nuisance activity. However, the argument there was that the trial court was not permitted to close the store "for any purpose" *at the temporary injunction stage* of the proceedings due to the following language of R.C. 3767.04(B)(3) dealing with that stage: "the court or judge forthwith shall issue an order closing the place against its use for any purpose of lewdness, assignation, prostitution, or other prohibited conduct until a final decision is rendered on the complaint for the requested permanent injunction." *Id.*

**{¶88}** Similarly, most of the pertinent portion of *Rothal* deals with this statutory provision for the temporary injunction stage. *Rothal v. Smith,* 151 Ohio App.3d 289, ¶ 100-106 ("we fail to understand how an order requiring the prohibited and lewd conduct in the bar to cease yet allowing the bar to operate would effectuate the intent of the temporary injunction."). *Id.* at ¶106. As one of the defendants seemed to be applying his argument to the permanent closure order as well, the court then cited to R.C. 3767.06(A), which states that the *prior closure order* shall continue for one year. *Id.* at ¶ 102, 107.

**{¶89}** Here, a temporary order was not issued, and the provision in R.C. 3767.04(B)(3) never arose. Rather, as discussed above, the applicable statute mandates the abatement order to "include an order directing the effectual closing of the place where the nuisance is found to exist against its use for any purpose and keeping it closed for a period of one year unless sooner released" (unless the exception created by *Rezcallah* applies). *See* R.C. 3767.06(A). As such, the argument on narrowly tailoring the order to delete the statutorily-required language "for any purpose" is without merit as the trial court could not tailor the order to eliminate

that phrase. Appellant cannot avoid the statute (as modified by *Rezcallah* for certain defendants) by this argument.

**{¶90}** Finally, appellant points to the language of R.C. 3767.06(A) providing that "[t]he order shall direct the removal from the place where the nuisance is found to exist of all personal property and contents used in conducting or maintaining the nuisance and not already released" under R.C. 3767.04(C) and order the property sold. In accordance, the trial court ordered: "all personal property and contents used in conducting or maintaining the nuisance (all personal property and contents confiscated by law enforcement authorities) shall be forfeited * * *."

**{¶91}** In a brief argument, appellant contends that this order was too broad because the statute only permits forfeiture of personal property and contents used in conducting the nuisance, the stores "are large business establishments that sold many products other than the incense and potpourri," and the court ordered all of the personal property and contents of the party centers forfeited as opposed to only the personal property and contents that was used in selling the illegal products. Appellant's Brief at 21-22, citing *Roszmann*, 89 Ohio App.3d at 780-781.

**{¶92}** In the Twelfth District case appellant relies upon and distinguishes, the trial court ordered the sale of "all personal property located at the Interstate Adult Arcade including, but not limited to, all video cassette recorders, all television monitors, all booths, all wiring and any and all other personal property used in the conduct and maintenance of the nuisance." *Roszmann*, 89 Ohio App.3d at 780. The defendant argued that the state failed to prove that the forfeited property was used in the nuisance. *Id.* The appellate court disagreed because the equipment specifically identified by the court was used in conducting the nuisance *and the defendant failed to identify any other items removed from the store which were not used in conducting or maintaining the nuisance.* *Id.* at 780-781 (noting that soda, snack, and pinball machines were returned to the appellant during the temporary stage).

**{¶93}** Here, the Bridgeport lieutenant was asked if, during his search of the Bridgeport store, he found lab reports from the supplier with the incense products that were seized. The officer stated that he seized anything that had information. (Tr. 40).

The Martins Ferry officer testified that in executing the search warrant on the Martins Ferry store, they took receipts, invoices, a few safes, and approximately $10,000 in cash. The only seized evidence referred to by Mr. Fryman was the lab reports from the suppliers. (Tr. 100). The items testified to as being seized can be viewed as being used to conduct or maintain the nuisance, and appellant does not identify what seized items were not used in conducting the nuisance to this court. *See Roszmann*, 89 Ohio App.3d at 780-781. Instead, he seems to misconstrue the court's order as requiring all contents of the businesses removed.

**{¶94}** Contrary to appellant's argument, the entry did not order the forfeiture of "all of the personal property and contents of the businesses." (Appellant's Brief at 21.) Rather, the trial court ordered the forfeiture of "all personal property and contents used in conducting or maintaining the nuisance" and defined that as "all personal property and contents confiscated by law enforcement authorities." The store remained open after the April 2013 search warrant (and is still open due to the trial court's grant of a stay pending appeal), no request was made to release any items unrelated to the nuisance, and there is no indication in the testimony on seized items that law enforcement seized all of the businesses' personalty and contents. This argument is overruled.

**{¶95}** For the foregoing reasons, the judgment of the trial court is hereby affirmed.

Donofrio, J., concurs.
Waite, J., concurs.