BEARD, ADMR., APPELLEE, *v.* MERIDIA HURON
HOSPITAL ET AL.; NICHOLSON, APPELLANT.

[Cite as *Beard v. Meridia Huron Hosp.*,
106 Ohio St.3d 237, 2005-Ohio-4787.]

(No. 2004-0048—Submitted February 1, 2005—Decided September 28, 2005.)

MOYER, C.J.

{¶ 1} The issue presented in this case concerns the extent to which an expert witness, testifying on direct examination, may make reference to professional literature, which is often referred to as "learned treatises." We hold that an expert witness may testify that his or her opinions are based, in part, on a review of professional literature. Applying this holding to the facts of the instant case, we reverse the judgment of the court of appeals and reinstate the order of the trial court.

I

{¶ 2} Defendant-appellant, Dr. Oscar Nicholson Jr., performed an elective hernia-repair operation on Ralph Moss. Moss died one week after the operation, and plaintiff-appellee, Charlene Beard, the administrator of his estate, brought a medical-malpractice action against appellant. Appellee alleged, among other things, that appellant should not have performed the operation, given that Moss's white-blood-cell count on the day before the operation was 2,300, while the reference range for a normal count is 4,500 to 11,000. Appellee asserts that Moss's low white-blood-cell count prevented him from being able to resist infection and, ultimately, led to his death.

{¶ 3} At trial, Dr. Richard Schlanger provided expert testimony on behalf of appellee, and Doctors Franklin Price and Andrew Pietzman testified as expert witnesses for appellant. Appellant also testified as an expert witness in his defense. He stated that his decision to operate on Moss was reasonable because Moss had benign familial neutropenia, a condition characterized by chronically low white-blood-cell counts. According to appellant, patients with benign familial neutropenia do not have a lowered ability to fight infection, despite their lower blood-cell counts. Appellant then testified as follows regarding the standard of care for operating on a patient with this condition.

{¶ 4} "Q. Now, what is the standard of care of a surgeon like yourself regarding what you need in terms of a white blood cell count to safely take a patient with benign familial neutropenia to surgery?

{¶ 5} "A. Patients who have benign familial neutropenia, if they have a complete white blood cell count and complete count meaning neutrophils, basophils, eosinophils and lymphocytes greater than one thousand, one thousand and above. And, this is something that's documented in the medical and surgical literature."

{¶ 6} Appellee objected to appellant's testimony, arguing that appellant's reference to the medical and surgical literature should be struck as inadmissible hearsay. The trial judge overruled the objection.

{¶ 7} Appellant then testified as follows that he met the standard of care in taking Moss to surgery with a white-blood-cell count of 2,300.

{¶ 8} "Q. Doctor, I'll ask my question again. Do you have an opinion as to a reasonable degree of medical probability that you met the accepted standard of care in taking Mr. Moss to surgery, with a white blood cell count of 2,300 and no differential, on December 12th, 2000?

{¶ 9} "A. Yes.

{¶ 10} "Q. What is that opinion?

{¶ 11} "A. That opinion is that I met the standard of care to take Mr. Moss to surgery.

{¶ 12} "Q. What is the basis of that opinion, Doctor?

{¶ 13} "A. That opinion is based on the fact that the medical and surgical literature states that patients who have benign familial neutropenia can be operated on safely with white blood cell counts greater than a thousand."

{¶ 14} Counsel for appellee again objected, arguing that appellant's second reference to the literature also constituted inadmissible hearsay. The trial court overruled this objection and appellant continued to address the bases for his opinion.

{¶ 15} "Q. Doctor, you made reference to the literature in your response. What literature are you referring to?

{¶ 16} "A. There are various review articles in the medical as well as surgical literature that deals [sic] with the benign, the condition of benign familial neutropenia.

{¶ 17} "Q. Is your opinion based also on your education and your training and your experience over the years?

{¶ 18} "A. Yes, it is."

{¶ 19} The jury returned a verdict in favor of appellant, and the trial court entered judgment consistent with the jury verdict. On appeal, the Eighth District Court of Appeals reversed the judgment and remanded the cause for a new trial, holding that the trial court had committed prejudicial error by admitting appellant's references to professional literature.

## II

{¶ 20} Decisions regarding the admissibility of evidence are within the broad discretion of the trial court. *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 224 N.E.2d 126. A decision to admit or exclude evidence will be upheld absent an abuse of discretion. *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 164–165, 17 O.O.3d 98, 407 N.E.2d 490. Even in the event of an abuse of discretion, a judgment will not be disturbed unless the abuse affected the substantial rights of the adverse party or is inconsistent with substantial justice. Id.

{¶ 21} Thus, we must first determine whether the trial court abused its discretion by admitting appellant's testimony. If we determine that the trial court abused its discretion, we must then determine whether appellee's substantial rights were undermined by admission of the testimony.

### A. Abuse of Discretion

{¶ 22} " 'The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140, quoting *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144. We conclude that the trial court did not abuse its discretion in allowing appellant's testimony, because his references to the professional literature did not constitute inadmissible hearsay.

{¶ 23} Hearsay is defined in Evid.R. 801(C) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Statements that fall within this definition are not admissible unless an exception is made by the United States or

Ohio Constitution, by Ohio statute, or by rules prescribed by this court. Evid.R. 802. Because works of professional literature contain statements that if introduced as evidence would fall within the definition of hearsay, and because the Ohio Rules of Evidence, unlike the Federal Rules of Evidence, do not contain a learned-treatise exception to the hearsay rule, such works "are inadmissible as independent evidence of the theories and opinions therein expressed." [1] *Piotrowski v. Corey Hosp.* (1961), 172 Ohio St. 61, 69, 15 O.O.2d 126, 173 N.E.2d 355. In *Piotrowski,* we noted that the reasons for exclusion include the inability to verify the validity of the opinions and conclusions within the works and the lack of opportunity to cross-examine the authors of those opinions and conclusions. Id. If, during direct examination, a witness were permitted to offer statements from professional literature to prove the truth of the matter asserted in those statements, the witness would be acting as a conduit for the out-of-court statements of the authors of those literary works.

{¶ 24} There is a difference between a witness's referring to specific statements in professional literature as substantive evidence and an *expert* witness's referring to the literature as being part of the basis for that expert's opinion. While the former reference would be inadmissible hearsay, numerous courts in Ohio have held [2] that the latter reference is admissible. We agree with the decisions in those cases.

{¶ 25} Our decision is consistent with the Ohio Rules of Evidence. Evid.R. 702(B) provides that a "witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." Pursuant to this rule, a witness becomes qualified to testify as an expert by virtue of the fact that he or she has been exposed to and has absorbed information from sources that may not be admissible under the Rules of Evidence. Evid.R. 703 states that an expert witness may base his or her opinion on facts or data "perceived by him or admitted in evidence at the hearing." However, we have acknowledged that information that would not be admissible at trial may serve as a basis for an expert's background knowledge without violating Evid.R. 703. See *State v. Mack* (1995), 73 Ohio St.3d 502, 512, 653 N.E.2d 329. Moreover, Evid.R. 706, the rule that permits impeachment with statements from

---

1. In Ohio, learned treatises may be used for impeachment purposes. Evid.R. 706. Evid.R. 706 provides that learned treatises may be used to show that an expert is unaware of their existence or unfamiliar with their contents. See, also, *Stinson v. England* (1994), 69 Ohio St.3d 451, 458, 633 N.E.2d 532. Additionally, the contents of a treatise may be used to impeach the credibility of a witness who relied on the treatise in forming his or her opinion or who acknowledges the authoritative nature of the treatise. Id.

2. See, e.g., *Compher v. Kroger Co.*, 5th Dist. No. 04 CA 12, 2005-Ohio-482, 2005 WL 299708, ¶ 47–80; *State v. Echols* (1998), 128 Ohio App.3d 677, 698, 716 N.E.2d 728; *Hart v. Lechnar* (June 7, 1991), 6th Dist. No. L–89–276, 1991 WL 97313.

learned treatises, is based on the premise that experts are likely to rely on professional literature in forming their opinions. Cf. *Stinson v. England* (1994), 69 Ohio St.3d 451, 633 N.E.2d 532, paragraph two of the syllabus (holding that "the substance of [a] treatise may be employed only to impeach the credibility of an expert witness who has relied upon the treatise * * * or has acknowledged its authoritative nature").

{¶ 26} Experts have been permitted to testify regarding the information that provides the basis for their opinions. See *State v. Echols* (1998), 128 Ohio App.3d 677, 698, 716 N.E.2d 728. Because experts are permitted to base their opinions on their education, including their review of professional literature, training, and experience, it follows that experts are also permitted to testify regarding that information. Accordingly, we hold that expert witnesses are permitted to testify that their opinions are based, in part, on their review of professional literature.

{¶ 27} In the case at bar, appellant made two references to the professional literature after describing benign familial neutropenia and stating his opinion with regard to the standard of care for operating on a patient with that condition.

{¶ 28} First, appellant confirmed that his opinion regarding the standard of care was consistent with findings "documented in the medical and surgical literature." Appellant did not offer a statement from the professional literature for its truth; indeed, appellant did not offer any *statement* from the literature for any purpose. Rather, by adding that his opinion regarding the standard of care was consistent with findings "documented in the medical and surgical literature," appellant merely confirmed that the detailed expert opinion he had just communicated to the jury was supported by the professional literature.

{¶ 29} When an expert testifies that his or her opinion is based in part on professional literature, the expert is essentially saying that the literature supports his or her opinion. Thus, appellant's first reference to the professional literature is consistent with the Ohio Rules of Evidence and does not violate the prohibition on learned treatises.

{¶ 30} Appellant subsequently testified that, in his expert opinion, he had met the standard of care in taking Moss to surgery with a white-blood-cell count of 2,300. His counsel asked him to explain the basis for his opinion, and appellant replied:

{¶ 31} "A. That opinion is based on the fact that the medical and surgical literature states that patients who have benign familial neutropenia can be operated on safely with white blood cell counts greater than a thousand."

{¶ 32} This second reference is more problematic than the first because by answering "the * * * literature states that * * *," appellant was apparently offering a *statement* from the literature. However, appellant did not offer

precise statements from the literature so that they might be considered independently to prove compliance with the standard of care in Moss's case. Instead, he merely referred to statements in the medical and surgical literature while explaining the basis for his previously articulated opinion that he had met the standard of care in Moss's case. Moreover, he clarified that he was referring, generally, to statements from "various review articles in the medical as well as surgical literature," that the literature provided only a *partial* basis for his opinion, and that his opinion was also based on his education, training, and experience. Pursuant to the Ohio Rules of Evidence, appellant is permitted to testify in this manner.

{¶ 33} We also note that the reasons for excluding treatise information expressed in *Piotrowski*, 172 Ohio St. 61, 15 O.O.2d 126, 173 N.E.2d 355, are not applicable here. Appellant did not act as a conduit for the out-of-court statements of others. Rather, he gleaned information from various sources, including medical and surgical literature, and used that information to reach his *own* opinion as to the applicable standard of care. He then testified under oath with regard to his opinion and was available for cross-examination regarding that opinion. Opposing counsel was free to use cross-examination to challenge appellant's reasoning, to verify the validity of his conclusions, and to attack the basis for his opinion.

{¶ 34} For these reasons, we hold that the trial court acted within its discretion in allowing appellant's testimony.

## B. Substantial Justice

{¶ 35} Even if we assume that the trial court abused its discretion in admitting appellant's testimony, reversal would not be warranted in this case. An improper evidentiary ruling constitutes reversible error only when the error affects the substantial rights of the adverse party or the ruling is inconsistent with substantial justice. *O'Brien*, 63 Ohio St.2d at 164–165, 17.O.O.3d 98, 407 N.E.2d 490. " 'Generally, in order to find that substantial justice has been done to [a party] so as to prevent reversal of a judgment for errors occurring at the trial, the reviewing court must not only weigh the prejudicial effect of those errors but also determine that, if those errors had not occurred, the jury or other trier of the facts would probably have made the same decision.' " Id., quoting *Hallworth v. Republic Steel Corp.* (1950), 153 Ohio St. 349, 41 O.O. 341, 91 N.E.2d 690, paragraph three of the syllabus. We conclude that the trial court's admission of appellant's testimony did not prejudice appellee's substantial rights.

{¶ 36} Appellant's general references to the literature confirmed and provided support for his previously stated opinion regarding the standard of care for performing surgery on a person with benign familial neutropenia. Therefore, the

jury would have heard his expert opinion regarding these matters even if the trial court had stricken his references to the literature.

{¶ 37} Two other experts—Drs. Price and Pietzman—provided testimony that supported appellant's contention that he met the standard of care under these circumstances. Dr. Price, Moss's treating oncologist, explained benign familial neutropenia and the fact that persons with this condition do not experience a lowered ability to fight infection, despite their lower-than-normal white-blood-cell counts. He also agreed with appellant that Moss's chronically low white-blood-cell count was consistent with benign familial neutropenia.

{¶ 38} Dr. Pietzman further corroborated appellant's contention that he had met the standard of care in operating on Moss. Dr. Pietzman testified that appellant's decision to operate was reasonable, given that Moss "had a chronically low white count and this was not a new or an acute process." He further stated that Moss's low white-blood-cell count was not a proximate cause of his death.

{¶ 39} Finally, the testimony proffered by appellee's expert, Dr. Schlanger, did not directly contradict appellant's alleged hearsay statements. Dr. Schlanger testified as follows:

{¶ 40} "Q: Okay. Doctor, do you have an opinion as to what the standard of care in Ohio demands of a surgeon with respect to a preoperative evaluation for a patient who has recently undergone chemotherapy?

{¶ 41} "A: I do have an opinion.

{¶ 42} "Q: And what is your opinion?

{¶ 43} "A: My opinion is that a patient that undergoes chemotherapy, that has just finished chemotherapy, needs to have the blood work looked at extremely carefully. And the fact that if the blood count is lower than acceptable standard, which in this case at 2.3 [x $10^3$], the patient either should have been sent back to the oncologist for possible either GSF or Lithium, which would have raised their white blood cell count to a safe level to proceed with surgery. I also would have looked at nutritional parameters to make sure that if the patient has an operation, they will heal. And neither of these things were done."

{¶ 44} Dr. Schlanger did not discuss benign familial neutropenia or the minimum white-blood-cell count that is required in order to operate on a person with that condition. Rather, he identified two methods for raising white-blood-cell counts and said that one of those methods should have been used to boost Moss's white-blood-cell count. He further stated that appellant ought to have evaluated Moss's ability to heal before taking Moss to surgery with a blood-cell count of 2,300. In fact, at oral argument in this appeal, appellee conceded that her expert did not contest appellant's contention that a person with benign

familial neutropenia can safely be operated on when he or she has a white-blood-cell count over 1,000.

{¶ 45} For the foregoing reasons, we conclude that the court of appeals erred when it reversed the judgment for appellant. The judgment of the court of appeals is reversed, and the order of the trial court is reinstated.

Judgment reversed.

LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

RESNICK and PFEIFER, JJ., dissent.

---

ALICE ROBIE RESNICK, J., dissenting.

{¶ 46} The court of appeals fully appreciated the nuances of the issue presented, applied the relevant precedents precisely as they should have been applied, and unanimously reached the right result, which was to reverse the jury verdict for appellant, Dr. Oscar Nicholson Jr., and to remand for a new trial. The majority loses focus on the true issue, misperceives the prejudicial nature of the testimony at issue, and reverses a well-reasoned judgment, thereby reinstating a flawed jury verdict. I dissent.

{¶ 47} In *Piotrowski v. Corey Hosp.* (1961), 172 Ohio St. 61, 15 O.O.2d 126, 173 N.E.2d 355, this court held at the syllabus:

{¶ 48} "Generally, it is prejudicial error to admit in evidence, over objection, medical articles or treatises as independent evidence of the theories and opinions therein expressed, and this is particularly true where the evidence in the case is conflicting and of such a character that a verdict for either party would be supportable."

{¶ 49} While paying lip service to *Piotrowski* and the Ohio Rules of Evidence as they apply to expert testimony and learned treatises, the majority strays from the fundamental principles that should guide our inquiry. It was the inherently prejudicial nature of the "independent evidence of the theories and opinions therein expressed" of the medical literature that concerned the court in *Piotrowski*. The court of appeals understood that a proper application of the reasoning underlying the result in *Piotrowski* compels a new trial in this case.

{¶ 50} Several times during his testimony, Dr. Nicholson referred to unspecified medical literature sources as supporting his opinion that he had met the standard of care. After Dr. Nicholson had testified for a second time that unnamed "medical and surgical literature" states a standard of care allowing patients with benign familial neutropenia to be operated on when their white-blood-cell counts are greater than 1,000, appellee's attorney approached the bench and renewed an earlier objection, stating, "We would ask that the response

to the question be stricken on the basis that his answer was that based upon the literature that he's read. Well, I can't, how can I cross-examine him when I don't know what he's read. And, it's a clear hearsay response. It's got to go out."

{¶ 51} The trial court refused a second time to strike Dr. Nicholson's references to medical literature. The trial court even appears to have invited a response from Dr. Nicholson that would have allowed him to improperly name specific literature, stating in response to the objection, "Overruled. Ask him what he read." Dr. Nicholson's attorney then requested Dr. Nicholson to specify the medical literature he was referring to. Although Dr. Nicholson did not name any specific piece of literature as his source, he testified, "There are various review articles in the medical as well as surgical literature that deals with the benign, the condition of benign familial neutropenia."

{¶ 52} Dr. Nicholson's attorney then led his client to add a qualifier to the mention of the unnamed literature as the sole source of Dr. Nicholson's opinion, asking in what appears to be an afterthought, "Is your opinion based also on your education and your training and your experience over the years?" Dr. Nicholson replied, "Yes, it is."

{¶ 53} I fully agree with the court of appeals' cogent analysis of why Dr. Nicholson's testimony was improper. The court of appeals acknowledged that "[w]hile learned treatises may not be admitted as evidence or relied on for the truth of the opinions stated therein, experts have been permitted to refer to literature generally as forming part of the basis for their opinion. See *Gartner v. Hemmer*, Hamilton App. No. C–010216, 2002-Ohio-2040 [2002 WL 727014]; *Limle v. Laboratory Corp. of Am.* (2000), 137 Ohio App.3d 434, 438–439 [738 N.E.2d 890]. We recognize that no one becomes an expert without research, education, training, and experience and that an expert is entitled to rely on this background in forming his opinion. However, there is a distinction between reference to literature as being part of the collective basis for an expert's opinion and reference to literature as substantive evidence."

{¶ 54} The court of appeals went on to elaborate precisely why Dr. Nicholson's testimony should not have been allowed:

{¶ 55} "In this case, Dr. Nicholson testified that the white blood cell count level to safely take a patient with benign familial neutropenia to surgery was greater than 1,000. He unequivocally stated that this is something that is documented in the medical and surgical literature. Dr. Nicholson also testified that the standard of care in taking Mr. Moss to surgery with a white blood cell count of 2,300 was met, based upon the fact that the medical and surgical literature states that patients who have benign familial neutropenia can be operated on safely with white blood cell counts greater than 1,000.

{¶ 56} "Dr. Nicholson's reference to the medical literature was used for the truth of the matter contained therein, not as a general basis for his opinion. Therefore, his testimony was hearsay and was used as substantive evidence. See *Pool v. Wade* (1996), 115 Ohio App.3d 449 [685 N.E.2d 791]; *Edwards v. Radecki* (May 14, 1993), Lucas App. No. L–92–042 [1993 WL 155632]. While Dr. Nicholson later stated his opinion was also based on his training, education, and experience, this does not change the fact that his earlier reference to the medical literature amounted to hearsay.

{¶ 57} "Moreover, Dr. Nicholson's testimony was not a generalized statement that incorporated medical literature with his education, training, and experience to form his opinion. Rather, Dr. Nicholson specifically stated [that] the fact that it is safe to operate on patients with benign familial neutropenia with white blood cell counts greater than 1,000 is documented in medical literature. In essence, Dr. Nicholson was relying on a phantom expert to support his opinion. While Dr. Nicholson may also have believed that he met the standard of care based on his education, training, and experience, his specific reference to medical literature to establish the level at which the standard was met was an improper use of the literature as substantive evidence.

{¶ 58} "We find that the trial court erred in allowing Dr. Nicholson's testimony on this matter as it was inadmissible hearsay."

{¶ 59} The court of appeals additionally correctly determined that the trial court's refusal to prevent Dr. Nicholson from testifying as he did about the medical literature was prejudicial to appellee: "Dr. Nicholson was permitted to rely on the literature as substantive evidence to support his opinion that Moss's white blood cell count was at a safe level to perform surgery. Further, it cannot be said that but for the error in allowing this testimony, the trier of fact would probably have made the same decision. Accordingly, we find that the trial court's action was inconsistent with substantial justice."

{¶ 60} I agree with the conclusion of the court of appeals that appellee was significantly prejudiced by Dr. Nicholson's improper references to unidentified "phantom" medical literature to support his alleged compliance with the applicable standard of care and that a new trial is warranted. This trial centered on whether Dr. Nicholson did, in fact, comply with that standard. The unspecified medical literature was used as substantive factual evidence of the standard of care, but was totally imprecise as to its origin and totally unambiguous as to the substance of its assertion. Appellee had no way to effectively cross-examine Dr. Nicholson to counter the effect of the references, and the jury's verdict was influenced by crucial testimony it should never have heard. I would affirm the judgment of the court of appeals.

PFEIFER, J., concurs in the foregoing dissenting opinion.

Novak, Robenalt, Pavlik & Scharf, L.L.P., William J. Novak, Thomas D. Robenalt, and Colin P. Sammon, for appellee.

Moscarino & Treu, L.L.P., Kris H. Treu, Edward S. Jerse, and Michael M. Matile, for appellant.