[Cite as *Brahm v. DHSC, LLC.*, 2019-Ohio-766.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| JAMES E. BRAHM, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF MARY KATHLEEN BRAHM, DECEASED | : : : : : | **JUDGES:** Hon. W. Scott Gwin, P.J. Hon. Patricia A. Delaney, J Hon. Craig R. Baldwin, J. |
| Plaintiff-Appellant | : : | Case No. 2018CA00100 |
| -vs- | : : | |
| DHSC, LLC, DBA AFFINITY MEDICAL CENTER, ET AL | : | OPINION |
| Defendants-Appellees | | |

CHARACTER OF PROCEEDING:     Civil appeal from the Stark County Court of
                              Common Pleas, Case No. 2014CV01545

JUDGMENT:                     Affirmed

DATE OF JUDGMENT ENTRY:       March 4, 2019

APPEARANCES:

For Plaintiff-Appellant               For Defendant-Appellee Joseph Surmitis

STEPHEN GRIFFIN                       STEPHEN FUNK
4051 Whipple Ave.                     222 South Main Street
Suite 201                             Akron, OH 44308
Canton, OH 44718

                                      For DHSC, LLC DBA Affinity Med. Center
                                      MICHAEL OCKERMAN
                                      3737 Embassy Parkway, Ste. 100
                                      Akron, OH 44333

*Gwin, P.J.*

{¶1} Appellant appeals the judgments in favor of appellees issued by the Stark County Court of Common Pleas.

*Facts & Procedural History*

{¶2} On June 30, 2014, appellant James E. Brahm, individually and as executor of the estate of Mary Kathleen Brahm, deceased, filed a complaint against appellee DHSC, LLC D/B/A Affinity Medical Center ("Affinity"), appellee Joseph Surmitis, M.D. ("Surmitis"), Paula Hostetler, R.N., Cinda Keener, R.N., Susan Kelley, R.N., and Kellee Mears, R.T. Appellant alleged in his complaint that on July 10, 2013, decedent Mrs. Brahm suffered a mild myocardial infarction, she was transported from her home to Affinity by EMS, the cardiac catheterization team at Affinity was called to perform a cardiac catheterization/stent procedure on Mrs. Brahm, and during the procedure, the walls of Mrs. Brahm's coronary artery were torn or ruptured. Appellant further averred the rupture caused Mrs. Brahm's blood volume to accumulate around her heart, constricting her heart, restricting its ability to move blood volume throughout her body, and placing her into cardiogenic shock. Appellant alleged subsequent efforts by Surmitis and his team to mitigate the harm caused by the ruptured coronary artery further comprised Mrs. Brahm's condition and Mrs. Brahm expired after subsequent cardiac surgery failed to repair and/or resume or restore her condition. Appellant included in his complaint claims for medical negligence survivorship, loss of consortium, and wrongful death.

{¶3} On December 8, 2014, the trial court granted appellant's motion to file a first amended complaint to add claims for punitive damages, negligent credentialing, and

agency by estoppel. On February 20, 2015, the trial court ordered bifurcation of appellant's negligent credentialing and punitive damages claims from appellant's medical negligence claims, but ordered discovery be conducted on all claims.

{¶4} Appellant voluntarily dismissed his claims against Cinda Keener, Kellee Mears, Paula Hostetler, and Susan Kelley on April 13, 2015.

{¶5} After multiple interlocutory appeals regarding discovery issues, the case went to trial on June 18, 2018. Appellant provided this Court with a partial transcript of the trial. The partial transcript contains an excerpt from June 20, 2018. The excerpt covers a motion hearing on Affinity's motion for directed verdict. Affinity argued that, based upon appellant's testimony that he signed a release, it was entitled to a directed verdict. Appellant argued the release was not sufficient based upon the *Clark* theory. The trial court granted Affinity's motion for directed verdict.

{¶6} The June 22, 2018 excerpt contains the testimony of Surmitis and Dr. Kevin Silver. On direct examination, Surmitis described the procedure he performed on Mrs. Brahm. Surmitis placed a sheath in Mrs. Brahm's right femoral vein and right femoral artery, and then inserted a pacemaker. Surmitis passed the wire through the distal part of the vessel and then moved on to the angioplasty, a procedure by which he uses balloons or stents to restore proper blood flow to a blood vessel. Surmitis placed the balloon into the midportion of the right coronary artery. Surmitis testified he used a 2.5 by 15 Maverick balloon, which is a compliant balloon that many interventionalists use. He re-established a flow of blood through the vessel and then deflated the balloon. Surmitis chose a Veriflex stent and inserted the stent, but sought to expand the stent further with a post-dilatation inflation of another balloon. Surmitis chose a 3.5 mm by 20 mm long

Maverick balloon. Surmitis does not believe the balloon he chose was oversized or that he used the wrong type of balloon. Surmitis testified the choice between using a compliant balloon and non-compliant balloon is based upon physician discretion and the Maverick balloon he used has the indication for being used for post-dilatation. Surmitis felt a non-compliant balloon could produce side effects due to the use of very high pressure.

{¶7} Surmitis testified he was trained and it is common practice to go over the manufacturer's burst pressure rating. Surmitis stated that, in this case, the balloon did not burst. After Surmitis' second inflation of the balloon, he had immediate problems, as blood was escaping from the middle portion of the stent. Surmitis testified the vessel perforated. Surmitis does not believe he was negligent in causing the rupture of the vessel because this is a risk in between 1 and 200 or 500 procedures, even with good technique. After Surmitis stopped the bleeding at the site, he felt Mrs. Brahm needed to have pericardiocentesis to try to drain some of the fluid around the heart. The pericardiocentesis procedure is where Surmitis would enter the pericardium, drain out the blood, allow the heart to expand, and then bring up the blood pressure. Surmitis testified he found out after surgery that the catheter tip was in the right ventricle, even though the indications in the cath lab were that it was the pericardium. Surmitis stated he did not believe he was negligent in placing the catheter because, while it was not in the desired place, it is a known complication of the procedure.

{¶8} On cross-examination, counsel for appellant asked Surmitis about an article written by Antonio Colombo in 2008 ("the Colombo article"). Counsel for Surmitis objected to the questioning regarding the article because it was not produced in discovery

and Surmitis did not have an opportunity to read it. The trial court overruled Surmitis' objection. Counsel read portions of the article indicating the use of non-compliant balloons for post-dilation inflation is preferred over compliant balloons and using a compliant balloon at high pressure post-dilation increases the risk of perforation. When being questioned about the data in the article regarding using a compliant or non-compliant balloon in post-dilatation, Surmitis testified the Colombo article is "just a snapshot of a few persons' thoughts from Italy, without any, you know, FDA guidance or anything. It's just their opinion at that point in time." Counsel for appellant asked, "And published in the American College of Cardiology Journal, right?" Surmitis responded, "Yeah. There is a large volume – this is only one article out of hundreds of thousands or millions of articles." Counsel for appellant then asked, "You've read that article, nowhere in that article does it advocate anywhere the use of compliant balloons in post-stent deployment dilatation?" Surmitis stated the article does not say that you cannot use compliant balloons for post-dilatation and he was justified in choosing to do so.

{¶9} On re-direct examination, Surmitis testified he is sure there is plenty of literature published on the topic from 2008 to 2013. Further, that from 2008 to 2013, there have been many advances and revisions of recommendations of how to use stents. Surmitis stated the balloon he chose for the post-dilatation was the appropriate size for the vessel he was going to post-dilate.

{¶10} Prior to Dr. Kevin Silver's ("Silver") testimony, counsel for appellant informed the trial court he intended to cross-examine Silver on several articles that Silver had not read and were not provided in discovery. Counsel sought to utilize these articles to impeach Silver. The trial court informed counsel he would permit such cross-

examination and asked counsel how many articles he would be utilizing. Counsel stated as follows: Well, I have three or four. But if we were going to use the article that we identified this morning because I do understand that I haven't – I don't want to drag this out this afternoon, everybody wants to get out this afternoon, I appreciate that. So rather than have to give them copies and spend a half hour, 45 minutes doing it, I'll just rely on the article that we produced this morning." When opposing counsel asked if the only piece of literature counsel for appellant was going to bring out is the one already discussed with Surmitis, counsel for appellant stated, "Yeah, just in the interest of judicial economy." The trial court stated if counsel for appellant chose to do something different during the cross-examination, he should approach the bench for a sidebar.

{¶11} Counsel for Surmitis called Silver as an expert witness. Silver testified his opinion is that Surmitis met the standard of care required of him. Silver noted Mrs. Brahm was a 72-year old woman, hypertensive, and cigarette smoker. Silver went through each step of Surmitis' procedure and stated each step was within the standard of care. As to the coronary artery perforation, Silver stated this is a well-recognized complication and Surmitis followed the protocol after the complication. Further, that the placement of the catheter into the right ventricle was a complication. Silver testified neither the perforation of the right coronary artery nor the placement of the catheter into the right ventricle was due to negligence by Surmitis. Silver stated the "blind" method Surmitis used in placing the catheter was reasonable, appropriate, and pursuant to the standard of care in such an emergency situation.

{¶12} As to the balloon selected and the pressure utilized, Silver testified there are two types of balloons, compliant balloons and noncompliant balloons, and under the

same pressures, the compliant balloons will stretch more than the noncompliant balloons. Silver stated the FDA has approved both type of balloons to be used to post-dilate stents. Silver testified it was reasonable of Surmitis to conclude if he inflated a balloon to the same pressure once, he would not oversize the balloon if he used it again under the same pressure. Silver opined there was a rupture because calcium in the artery pushed through the vessel wall. Silver testified the Maverick balloon Surmitis used was one of several balloons that are equally acceptable for post-dilation inflation and that Surmitis inserted the balloon appropriately and the balloon was expanded appropriately.

{¶13} When Silver was asked how he could inflate a balloon to higher atmospheres of pressure when the manufacturer says the limit is lower, Silver testified as follows:

They typically go to high pressures. And there were studies back in the 1990's, late 1990's, supporting this. I believe one of the articles was pulled for that. And that's a review article, but there are many articles and there are many studies done. Now it's become standard of care. I go to between two and three interventional courses every year where we watch anywhere from 10 to 50 live cases being done from around the world, and these cases are brought in by satellite, you watch them on a big screen, and you can go up to a microphone, you can talk to the operator while they're doing these cases and you ask them questions: Why are you inflating? Why'd you use that balloon? Why did you use this pressure? You know, and this is not just in Cleveland, this is throughout the United States,

this is throughout the world. This is standard of care. I've seen people go very, very high atmospheres just to get the balloon to be the right size.

{¶14} Silver testified the numbers on the manufacturer's literature are a rough idea and every patient is different. Silver stated he goes over the manufacturer's limit on pressures greater than fifty percent of the time. Further, his partners, who have trained in a variety of different places, all go over the rated burst when they post-dilate a stent because this has become a standard of care.

{¶15} On cross-examination, Silver confirmed that he did not have the names of any of the articles supporting high pressures. Silver testified "there are many different articles, it would be hard for me to list them all. So, no, I did not give him the names." Silver confirmed that in his deposition, he did not give the names of any of the articles, but referred to various journals such as the Journal of the American College of Cardiology and New England Journal of Medicine. Silver also gave counsel the name of Antonio Colombo. Counsel inquired as to why, seven months after his deposition, Silver still didn't have the name of one article that he is basing his opinions on and Silver testified, "I did not bring an article or book with me."

{¶16} Later in cross-examination, counsel for appellant inquired as to whether the literature differentiates between complications that are negligent and those that are not. Silver testified the literature does not. The end of Silver's testimony and cross-examination is the end of the transcript excerpt provided to this Court.

{¶17} On June 25, 2018, the jury found in favor of Surmitis on both appellant's survivorship claim and wrongful death claim. In the jury interrogatories, the jury found appellant did not prove by a preponderance of the evidence that the care provided to Mrs.

Brahm by Surmitis was negligent.  The trial court issued a judgment entry on the verdict on June 26, 2018, awarding judgment to Surmitis.

{¶18}  Appellant filed a motion to enforce settlement agreement on July 5, 2018. Attached to the motion is the affidavit of counsel for appellant, stating all factual allegations set forth in the motion are verified and authenticated and all attached exhibits/correspondence were prepared by him.  The exhibits consist of several e-mails between counsel for appellant, counsel for Affinity, and their office staff.

{¶19}  Counsel for appellant e-mailed Affinity on Thursday, June 21, 2018, stating the family appreciated the $50,000 offer to settle as communicated by the trial judge and stating he was authorized to offer Affinity a full and final release for $120,000.  On Friday, counsel for Affinity responded that the carrier was not interested in increasing their offer, but if counsel for appellant wanted to talk, he should call counsel for Affinity.  The following Monday, counsel for appellant sent an e-mail stating appellant accepted the offer of $50,000 as a cost settlement and, in exchange, no appeal would be filed on the court's ruling awarding Affinity a directed verdict and, further, appellant would file a voluntary dismissal with prejudice to Affinity on the negligent credentialing claim.  Counsel for Affinity thanked him for his response.

{¶20} On Tuesday, counsel for appellant's assistant e-mailed counsel for appellant, stating counsel for appellee's office told her Brahm had to be on the check since it is being settled on their behalf.  The assistant sent an e-mail to the office staff of Affinity's counsel informing them who to make the check out to and Affinity's counsel's staff responded, "Got it."  Later than afternoon, counsel for Affinity sent counsel for appellant an e-mail stating it was their position that when they offered $50,000 and

appellant countered at $120,000 and they refused the demand of $120,000, the offer of $50,000 was off the table and thus there was no offer on the table to be accepted by appellant on June 25th.

{¶21} In his motion, appellant argues Affinity did not limit their offer in time or duration and appellant accepted the offer prior to the verdict; thus the parties resolved their claims for $50,000 in exchange for a promise not to appeal the directed verdict ruling and a dismissal of the negligent credentialing claim with prejudice. Appellant also contends the office staff of the attorneys acted in conformity with a meeting of the minds for settlement. Appellant stated in his motion that all supportive exhibits were attached. Appellant did not request a hearing on the motion to enforce.

{¶22} Appellant filed a notice of voluntary dismissal, with prejudice, of his negligent credentialing claim, but subsequently filed a notice of withdrawal of the dismissal after the trial court overruled appellant's motion to enforce.

{¶23} The trial court overruled appellant's motion to enforce settlement agreement on July 12, 2018.

{¶24} Appellant appeals the judgments in favor of appellees issued by the Stark County Court of Common Pleas and assigns the following as error:

{¶25} "I. THE TRIAL COURT ERRED IN PERMITTING DR. SURMITIS AND HIS EXPERTS TO TESTIFY THAT THEIR OPINIONS REGARDING THE SELECTION AND DEPLOYMENT OF A COMPLIANT BALLOON IN A POST-DILATION INFLATION WERE SUPPORTED BY THE 'MEDICAL LITERATURE.'

{¶26} "II. THE TRIAL COURT ERRED IN PERMITTING DR. SURMITIS' EXPERT TO TESTIFY THAT 'EVERYONE' OVERINFLATES COMPLIANT BALLOONS IN A POST-DILATION INFLATION.

{¶27} "III. THE TRIAL COURT ERRED IN DIRECTING A VERDICT IN FAVOR OF AFFINITY MEDICAL CENTER UPON PLAINTIFF'S AGENCY BY ESTOPPEL LIABILITY THEORY.

{¶28} "IV. THE TRIAL COURT ERRED IN FAILING TO CONDUCT A HEARING ON PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT BETWEEN PLAINTIFF AND AFFINITY MEDICAL CENTER.

{¶29} "V. THE TRIAL COURT'S ERRONEOUS RULINGS COLLECTIVELY DEPRIVED PLAINTIFF OF A FAIR TRIAL AND CONSTITUTED CUMULATIVE ERROR, WARRANTING A NEW TRIAL."

## I. & II.

{¶30} In his first and second assignment of error, appellant argues the trial court erred in allowing Surmitis and Silver to refer to certain medical literature during their testimony. Appellant also contends the trial court erred in allowing Silver to testify about his observations at medical conferences and to the techniques used by his colleagues.

{¶31} Decisions regarding the admissibility of evidence are within the broad discretion of the trial court. *Beard v. Meridia Huron Hospital*, 106 Ohio St.3d 237, 834 N.E.2d 323 (2005). A decision to admit or exclude evidence will be upheld absent an abuse of discretion. *Id.* Abuse of discretion is more than an error of law or judgment; rather, it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

**{¶32}** "An improper evidentiary ruling constitutes reversible error only when the error affects the substantial rights of the adverse party or the ruling is inconsistent with substantial justice." *Beard v. Meridia Huron Hospital*, 106 Ohio St.3d 237, 834 N.E.2d 323 (2005). To determine if a ruling affects the substantial rights of the adverse party or is inconsistent with substantial justice, a "reviewing court must not only weigh the prejudicial effects of those errors but also determine that, if those errors had not occurred, the jury * * * would probably have made the same decision." *Id.*

**{¶33}** We first note that appellant did not object to any of the testimony he now seeks to argue that the trial court erred in admitting. It is well-settled that a party must object in order to preserve an issue for appeal. See, e.g., *State v. Jones*, 91 Ohio St.3d 335, 2001-Ohio-57, 744 N.E.2d 1163; *State v. Robb*, 88 Ohio St.3d 59, 723 N.E.2d 1019 (2000).

**{¶34}** Because appellant failed to object to the testimony during the trial, we must determine whether the trial court committed plain error in allowing the testimony. To invoke the plain error doctrine, the party claiming error must establish: (1) that an error, i.e., a deviation from a legal rule, occurred; (2) that the error was an "obvious" defect in the trial proceedings; and (3) that this obvious error affected substantial rights, i.e., the error must have affected the outcome of the trial. *State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, 103 N.E.3d 784. In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error seriously affects the basic fairness, integrity, or public reputation of the judicial process itself. *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997). The Ohio Supreme Court stated the public's confidence is rarely

upset merely by forcing civil litigants to live with the errors they themselves or the attorney chosen by them committed at trial. *Id.* Plain error does not exist unless it can be said that but for the error, the outcome of the trial would have clearly been otherwise. *State v. Moreland*, 50 Ohio St.3d 58, 552 N.E.2d 58 (1990); *In the Matter of D.M.*, 5th Dist. Guernsey No. 18 CA 18, 2018-Ohio-4737.

**{¶35}** Appellant first contends the trial court erred in allowing the testimony of Surmitis that, "There is a large volume – this is only one article out of hundreds of thousands or millions of articles." This testimony was given by Surmitis on cross-examination, when counsel for appellant questioned him about the Colombo article and whether the Colombo article was published in the American College of Cardiology Journal.

**{¶36}** Appellant also argues the trial court erred in allowing the testimony of Silver that "we typically go to high pressures. And there were studies back in the 1990's supporting this. I believe that one of the articles was pulled for that. And that's a review article, but there are many articles and there are many studies done."

**{¶37}** Appellant contends the trial court erred in admitting Silver's testimony about watching "anywhere from 10 to 50 live cases being done from around the world * * * this is not just in Cleveland, this is throughout the United States, this is throughout the world. This is standard of care. I've seen people go very, very high atmospheres just to get the balloon to be the right size."

**{¶38}** In *Beard v. Meridia Huron Hospital*, the Ohio Supreme Court held that "an expert witness may testify that his or her opinions are based, in part, on a review of professional literature." 106 Ohio St.3d 237, 834 N.E.2d 323 (2005). The Supreme Court

reasoned that experts are permitted to testify regarding the information that provides the basis for their opinions and because experts are permitted to base their opinion on their education, including review of professional literature, training, and experience, it follows that experts are also allowed to testify regarding that information. *Id.*

**{¶39}** As stated by the Ohio Supreme Court and previously cited by this Court, "there is a difference between a witness's referring to specific statements in professional literature as substantive evidence and an *expert* witness's referring to the literature as being part of the basis for that expert's opinion. While the former reference would be inadmissible hearsay, numerous courts in Ohio have held that the latter reference is admissible. We agree with the decisions in those cases." *Id.*; *State v. Cheesman*, 5th Dist. Fairfield No. 15 CA 59, 2016-Ohio-5040.

**{¶40}** Evidence Rule 803(18) allows for a learned-treatise exception to the hearsay rule. The exception to the hearsay rule contained in Evidence Rule 803(18) was adopted in acknowledgment of the fact that "every expert brings a certain amount of 'background hearsay' to his or her opinion, in the form of the out-of-court statements of textbook authors, colleagues, and others that forms much of the basis of the expert's training and education. Ohio law now allows experts to rely on that knowledge in establishing their qualifications and in forming opinions." 2006 Staff Notes to Evid.R. 803(18).

**{¶41}** In this case, the reference to medical literature by Surmitis and Silver is not inadmissible hearsay. The testimony by Surmitis was in response to a question by counsel for appellant on cross-examination about the Colombo article. Surmitis did not seek to introduce any specific article as substantive evidence in violation of Evid.R.

803(18) and did not present any testimony that violated *Beard*.  Silver's testimony about the "studies back in the 1990's" was made while Silver was explaining the basis for his opinion on the standard of care.  Silver did not seek to admit any medical literature itself as substantive evidence.  Such testimony is specifically allowed pursuant to *Beard* and Evid.R. 803(18).  Further, Silver's testimony about medical procedures in Cleveland and throughout the world is not testimony about what others "told" him at the medical conferences, but was testimony by Silver as to what he actually observed at medical conferences, watching via satellite on a big screen.  Thus, Silver was testifying about his own background and experience in order to explain the basis of his opinion in compliance with *Beard* and Evid.R. 803(18).

{¶42}  Appellant cites *Piotrowski v. Corey Hospital* in support of his arguments. 172 Ohio St. 61, 173 N.E.2d 355 (1961).  In *Piotrowski*, the Court found it was prejudicial error to admit an Ohio State Medical Journal article as an exhibit over objection and with the comments favorable to the plaintiff underlined in ink.  *Id.*  The Court held, "generally, it is prejudicial error to admit in evidence over objection, medical articles or treatises as independent evidence of the theories and opinions therein expressed, and this is particularly true where the evidence in the case is conflicting * * *."  The same reasoning is not applicable in this case.  Appellant did not object to the testimony.  Neither Surmitis nor Silver acted as a conduit for the out-of-court statements of others.  Surmitis was answering a question on cross-examination regarding the Colombo article.  Silver utilized information from various sources, including medical literature, to reach his own opinion about the applicable standard of care.  Silver testified to his opinion and was cross-

examined regarding that opinion during which counsel for appellant challenged his reasoning and attacked the basis for his opinion.

**{¶43}** Appellant lastly argues that because neither Surmitis nor Silver ever produced one specific piece of literature to support their testimony, he had no way to effectively cross-examine Surmitis or Silver to counter the effect of their testimony about medical literature. Additionally, appellant states he could not effectively cross-examine Silver with specific articles due to the length of time it took to elicit the testimony regarding appellant's introduction and cross-examination with the Colombo article.

**{¶44}** Appellant essentially advances the argument of the dissent in *Beard* that a party suffers significant prejudice when an expert is permitted to refer to unspecified and vague medical literature. *Beard v. Meridia Huron Hospital*, 106 Ohio St.3d 237, 834 N.E.2d 323 (2005). However, as detailed above, this is not the holding of the majority in *Beard*. See also *Morris v. McQuillen*, 5th Dist. Richland No. 2008-CA-87, 2009-Ohio-2848 (finding no plain error when there was no objection to the testimony and when the appellant had the opportunity to cross-examine appellee on the testimony); *State v. Henderson*, 6th Dist. Ottawa No. OT-15-047, OT-15-048, 2017-Ohio-412 (overruling appellant's argument that the trial court abused its discretion in allowing the expert to make repeated references to literature, but never identifying specific literature or admitting it into evidence and finding no abuse of discretion in allowing expert to reference literature that assisted him in forming his opinion); *Werden v. The Children's Hosp. Med. Ctr.*, 1st Dist. Hamilton No. C-040889, 2006-Ohio-4600 (overruling appellant's argument that permitting an expert to mention various studies without specifying the particular literature prevented effective cross-examination and finding it was proper to allow the expert to

refer to articles and literature to support his opinion); *Schultz v. Mayfield Neurological Inst.*, 1st Dist. Hamilton No. C-120764. 2013-Ohio-4146 (overruling appellant's argument that the trial court erred by permitting expert to cite medical literature without providing specific citation or source and preventing effective cross-examination and finding the trial court properly allowed the expert to make general references to professional literature in support of opinions).

{¶45} The trial court permitted counsel for appellant to cross-examine both Surmitis and Silver about the statements they made regarding medical literature. Counsel for appellant specifically cross-examined Silver about his testimony on medical literature. Further, it was counsel for appellant's choice to limit cross-examination to the Colombo article "in the interest of judicial economy," as the trial court stated it would permit counsel for appellant to cross-examine Silver and/or Surmitis in similar fashion as was done with the Colombo article. It was additionally counsel for appellant's choice not to produce these articles in discovery such that the jury was excused for a period of time while the expert read each article and confirmed the text was authoritative. Evidence Rule 803(18) states a party may use a medical journal article to cross-examine an expert witness, but it does not prohibit a trial court from allowing the expert witness to read the article prior to cross-examination.

{¶46} Additionally, appellant has not demonstrated the admission of the testimony at issue affected his substantial rights. To determine if a ruling affects appellant's substantial rights, we must find that "if those errors had not occurred, the jury * * * would probably have made the same decision." *Beard v. Meridia Huron Hospital*, 106 Ohio St.3d 237, 834 N.E.2d 323 (2005). In this case, because appellant only provided a partial

transcript of a multiple day trial, we must presume the regularity of the proceedings. *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 300 N.E.2d 384 (1980).

**{¶47}** Based on the foregoing, we find appellant cannot show that a deviation from a legal rule occurred, that the alleged error was an "obvious" defect in the trial proceedings and that this error affected the outcome of the trial. Accordingly, the plain error doctrine does not apply. Appellant's first and second assignment of error are overruled.

III.

**{¶48}** In his third assignment of error, appellant contends the trial court erred in directing a verdict on his claim against Affinity.

**{¶49}** Our standard of review for the grant or denial of a motion for a directed verdict is whether there is probative evidence which, if believed, would permit reasonable minds to come to different conclusions as to the essential elements of the case, construing the evidence most strongly in favor of the non-movant. *Sanek v. Duracote Corp.*, 43 Ohio St.3d 169, 539 N.E.2d 1114 (1989). A motion for a directed verdict therefore presents a question of law, and an appellate court conducts a de novo review of the lower court's judgment. *Shadle v. Morris*, 5th Dist. Stark No. 2012CA00073, 2013-Ohio-906.

**{¶50}** Appellant contends the trial court failed to properly apply the law in *Clark v. Southview*. In *Clark*, the Ohio Supreme Court held that a hospital may be held liable under the doctrine of agency by estoppel for the negligence of independent medical practitioners practicing in the hospital where: (1) it holds itself out to the public as a provider of medical services; and (2) in the absence of notice or knowledge to the contrary, the patient looks to the hospital, as opposed to the individual practitioner, to

provide competent medical care.  68 Ohio St.3d 435, 628 N.E.2d 46 (1994).  With regard to notice to the patient that care is being provided by independent medical practitioners, "such notice, to be effective, must come at a meaningful time."  *Id.*

**{¶51}** Appellant argues the trial court's ruling ignored evidence in the record establishing a prima facie case for the jury to decide whether Mrs. Brahm looked to Affinity to provide her care.  Specifically, appellant alleges Mrs. Brahm expressly requested Affinity when she was transported by EMS and cites to an exhibit in his supplemental brief in opposition to Affinity's motion in limine to support his argument.  However, the excerpt of the transcript provided to this Court does not demonstrate that appellant presented this evidence at trial, as the only portion of the trial transcript presented to this Court prior to the directed verdict is the excerpt containing the oral arguments of the parties regarding the directed verdict and motions in limine regarding the testimony of Surmitis and Silver.  Accordingly, we must presume the regularity of the proceedings.  *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 300 N.E.2d 384 (1980).

**{¶52}** Appellant also argues the trial court failed to properly apply the second portion of *Clark* because the release signed by appellant did not constitute notice at a "meaningful time."  In the portion of the transcript submitted to this Court, during oral argument on Affinity's motion for directed verdict, Affinity argued the release signed by appellant was sufficient to constitute meaningful notice, whereas appellant argued the notice was not meaningful because it was given after Mrs. Brahm arrived at Affinity.

**{¶53}** While the Ohio Supreme Court stated in *Clark* that notice after a patient arrives at a hospital "rarely" provides the patient with the ability to choose at a meaningful time, without the portion of the trial transcript containing the testimony about the release

or evidence and testimony concerning the language contained in the release, we must presume the regularity of the proceedings. *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 300 N.E.2d 384 (1980).

**{¶54}** Moreover, we find the rule in *Clark* inapplicable in this case because, due to the verdict of favor of Surmitis, the jury would not have considered appellant's agency-by-estoppel claim against Affinity. *Germanoff v. Aultman Hosp.*, 5th Dist. Stark No. 2001CA00306, 2002-Ohio-5054; *Waikem v. Cleveland Clinic Found.* 5th Dist. Stark No. 2011CA00234, 2012-Ohio-5620. The jury found no underlying "negligence of independent medical practitioners" for which Affinity could be vicariously liable. Our disposition of appellant's first, second, and fifth assignments of error affirms the jury's verdict with respect to Surmitis and thus *Clark* is inapplicable.

**{¶55}** Appellant's third assignment of error is overruled.

IV.

**{¶56}** In his fourth assignment of error, appellant argues the trial court erred in failing to conduct a hearing on his motion to enforce settlement agreement with Affinity. Appellant cites *Rulli v. Fan Company* in support of his argument.

**{¶57}** In *Rulli*, the trial court refused to consider additional evidence plaintiff attempted to admit at the oral argument on the motion to enforce settlement. *Rulli v. Fan Co.*, 79 Ohio St.3d 374, 683 N.E.2d 337 (1997). The Ohio Supreme Court held the trial court erred by enforcing a purported settlement agreement between the parties without first conducting an evidentiary hearing where there was a legitimate dispute between the parties as to the existence of a settlement agreement because a court may not force an agreement upon the parties. *Id.* In this case, unlike the situation in *Rulli*, the trial court

refused to enforce what appellant purported to be an enforceable agreement, finding the parties never actually reached an agreement.  See *FirstMerit Bank, N.A. v. Ashland Lakes, LLC*, 5th Dist. Ashland No. 11-COA-017.  Unlike in *Rulli*, the appellant in this case submitted the evidence, via an affidavit and authenticated exhibits, that he alleged demonstrated a settlement agreement and averred in his motion that "all supportive exhibits and an affidavit are attached."  Appellant's affidavit and exhibits do not establish the parties reached a meeting of the minds as to all the terms.  In the absence of a legitimate factual dispute, the trial court was not required to conduct an evidentiary hearing.  *Id.*

{¶58} Further, appellant did not request a hearing on his motion to enforce settlement.  As this Court has previously stated, the failure of a party to request a hearing constitutes waiver of the right to an evidentiary hearing on a motion to enforce settlement. *M&G Automotive Services, Inc. v. Bouscher*, 5th Dist. Tuscarawas No. 2014 AP 03 009, 2014-Ohio-5370; *Brown v. Spitzer Chevrolet Co.*, 5th Dist. Stark No. 2012 CA 00105, 2012-Ohio-5623; *Monea v.* Campisi, 5th Dist. Stark No. 2004CA00381, 2005-Ohio-5212. An appellate court need not consider any error which counsel could have, but did not, call to the trial court's attention when the error could have been avoided or corrected.  *Id.* Appellant waived his right to an evidentiary hearing by failing to request such a hearing. *Id.*

{¶59} Appelllant's fourth assignment of error is overruled.

V.

{¶60} In his fifth assignment of error, appellant contends the cumulative effect of the trial court's errors denied him a fair trial.  Appellant cites the following as cumulative

error in this case: allowing the hearsay statements of Surmitis and Silver regarding medical literature; appellant could not properly and effectively cross-examine Surmitis and Silver on their assertions regarding medical literature; and the jury was left to wonder mid-trial why Affinity was no longer at the trial table.

{¶61} Pursuant to the cumulative error doctrine, which is usually presented in criminal cases, a conviction will be reversed where the cumulative effect of errors in a trial deprives the defendant of the constitutional right to a fair trial even though each individual error by itself does not constitute cause for reversal. *State v. Garner*, 74 Ohio St.3d 49, 656 N.E.2d 623 (1995). Ohio courts have found "the extension of the cumulative error doctrine to civil cases is warranted where the court is confronted with several errors, which either are harmless individually or have marginally prejudicial effects, but combine to require a new trial." *Edge v. Fairview Hospital*, 8th Dist. Cuyahoga No. 95215, 2011-Ohio-2148.

{¶62} In this case, as detailed above, we do not find any error in the testimony and/or cross-examination of Surmitis or Silver. Further, as to Affinity's dismissal during the trial, the trial court issued a curative instruction as soon as he dismissed Affinity, stating, "Ladies and gentleman, as you will note, Affinity Medical Center is no longer involved in this case. You are not to speculate as to the reason why or draw any inference therefrom as a result of their absence in the courtroom." Accordingly, we do not find the cumulative error doctrine applicable here where there have not been multiple errors. See *Snell v. Snell*, 5th Dist. Richland No. 13CA80, 2014-Ohio-3285. Additionally, without a full transcript of the trial, we cannot say that any alleged errors were so prejudicial that

appellant was deprived of a fair trial, as we must presume the regularity of the proceedings. *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 300 N.E.2d 384 (1980).

**{¶63}** Appellant's fifth assignment of error is overruled.

**{¶64}** Based on the foregoing, appellant's assignments of error are overruled.

**{¶65}** The judgments in favor of appellees by the Stark County Court of Common Pleas are affirmed.

By Gwin, P.J.,

Delaney, J., and

Baldwin, J., concur